176 F.3d 1231
 99 Cal. Daily Op. Serv. 4076, 1999 Daily
Journal D.A.R. 5209
Roger CHRISTIE and Ernest Aaron Anderson, Plaintiffs-Appellants,
v.
G. Kay IOPA, in her personal capacity; Jay Kimura, in his
personal capacity; the County of Hawai'i; and
Does 1-10, Defendants-Appellees.
 No. 98-16547.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 27, 1999.
Filed June 1, 1999.
 
 Steven D. Strauss, Hilo, Hawaii, for the plaintiffs-appellants.
 Joseph Kamelamela and Steven Christensen, Deputy Corporation Counsel, County of Hawaii, Hilo, Hawaii, for the defendants-appellees.
 Appeal from the United States District Court for the District of Hawai'i; David Alan Ezra, District Judge, Presiding. D.C. No. CV-95-01026-DAE.
 Before: FARRIS, NOONAN, and GRABER, Circuit Judges.
 GRABER, Circuit Judge:
 
 
 1
 In this action brought under 42 U.S.C. § 1983, Plaintiffs allege that a deputy prosecutor for the County of Hawaii violated their constitutional rights. The district court granted the County's motion for summary judgment, holding that the County is not legally responsible for the deputy prosecutor's acts. For the reasons that follow, we affirm as to plaintiff Christie, but reverse as to plaintiff Anderson.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Because the district court granted summary judgment, we view the evidence in the light most favorable to the nonmoving party. See Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 3
 Plaintiffs advocate the legalization of marijuana, and they are well known for that advocacy. They also have worked to expand the commercial use of hemp, including its use as food and clothing. Commercial sterilized hemp seeds are readily available at stores in Hawaii, such as Walmart; often, these seeds are mixed with other types of seed and sold as bird seed. In April 1991, Anderson ordered 25 pounds of sterilized commercial hemp seeds on behalf of Plaintiffs. The police seized Plaintiffs' order and charged them with Promotion of a Detrimental Drug in the Second Degree, a felony. Before Plaintiffs' arrest, no one in the County of Hawaii ever had been prosecuted for possession of commercial sterilized hemp seeds.
 
 
 4
 On January 9, 1992, deputy prosecutor Iopa sought a grand jury indictment against Plaintiffs, at least in part because of their advocacy for the legalization of marijuana:
 
 
 5
 As a practical matter, no, we're not going to go out, bust the little old lady that's got a bag of bird seeds just because there is one marijuana seed in there. Um, when you get twenty-five pounds within an order for five hundred pounds or more, going to, um, a hemp grower, that is very vocally, very outwardly advocating the legalization of marijuana.
 
 
 6
 (Emphasis added.) To obtain the indictment, Iopa presented false evidence that Plaintiffs' hemp seeds had germinated when tested.
 
 
 7
 After obtaining the indictment, Iopa offered to enter into a plea agreement with Plaintiffs. However, Iopa refused to negotiate unless Plaintiffs agreed not to write any more letters to the newspaper about the case.
 
 
 8
 On October 30, 1995, the Hawaii court dismissed criminal charges against Christie without prejudice and, on March 4, 1998, the court dismissed the indictment against Anderson after a jury's deadlock had caused a mistrial.
 
 
 9
 After Christie's case had been dismissed, on December 15, 1995, Plaintiffs filed the present complaint alleging that Iopa, Hawaii Prosecutor Kimura, and the County had violated their rights to speak freely, to petition the government, and to be free from government oppression.[1] Plaintiffs included similar state-law claims. The County moved for judgment on the pleadings, arguing in part that it enjoys Eleventh Amendment immunity. The district court disagreed, but sua sponte granted judgment on the pleadings to Iopa and Kimura. The County appealed the Eleventh Amendment ruling to this court, which affirmed in an unpublished disposition. See Christie v. Iopa, 121 F.3d 714, 1997 WL 429413 (9th Cir.1997) (unpublished table decision).
 
 
 10
 On remand, the County twice moved for summary judgment, arguing that it was not legally responsible for Iopa's alleged violations of Plaintiffs' constitutional rights. The court denied the first motion, but granted the second. Plaintiffs then moved for reconsideration, which the district court denied. Thereafter, the district court declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims and, therefore, dismissed the case. This timely appeal ensued.
 
 STANDARD OF REVIEW
 
 11
 We review de novo a district court's grant of summary judgment to determine "whether the district court correctly applied the law and if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact." Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998).
 
 DISCUSSION
 Title 42 U.S.C. § 1983 provides in part:
 
 12
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
 
 
 13
 (Emphasis added.) Congress intended the term "person" to include municipalities, such as the County here. See Monell v. Department of Social Serv. of N.Y., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Nevertheless, Congress did not intend to create respondeat superior liability. See id. at 691, 98 S.Ct. 2018 ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."); see also Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior. "). Instead, Congress intended to hold municipalities liable only when "action pursuant to official municipal policy of some nature caused a constitutional tort." Monell, 436 U.S. at 691, 98 S.Ct. 2018. "The 'official policy' requirement 'was intended to distinguish acts of the municipality from acts of employees of the municipality,' and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (emphasis in original).
 
 
 14
 Although a constitutional violation must result from "official municipal policy," a county need not expressly adopt the policy. It is sufficient that the constitutional violation occurred pursuant to a "longstanding practice or custom." Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir.1992); see Brown, 520 U.S. at 404, 117 S.Ct. 1382 ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.").
 
 
 15
 Plaintiffs cannot satisfy the requirement of a longstanding practice or custom, because they allege to the contrary that a county official has singled them out for unique treatment. A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom. See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir.1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); Thompson v. City of Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir.1989) ("Consistent with the commonly understood meaning of custom, proof of random acts or isolated events [is] insufficient to establish custom.").
 
 
 16
 There are, however, three situations in which isolated constitutional violations are sufficient to establish a municipal "policy." We consider each in turn.
 
 A. Final Policymaking Authority
 
 17
 First, a municipality can be liable for an isolated constitutional violation when the person causing the violation has "final policymaking authority." See City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."); Gillette, 979 F.2d at 1347 ("[T]he Supreme Court held that a single decision by a municipal policymaker may be sufficient to trigger section 1983 liability under Monell, even though the decision is not intended to govern future situations."). Whether an official has final policymaking authority is a question for the court to decide based on state law. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) ("[W]hether a particular official has 'final policymaking authority' is a question of state law. As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury.") (emphasis in original) (citations and internal quotation marks omitted).
 
 
 18
 The district court held that Hawaii Prosecutor Kimura possessed final policymaking authority to decide whom to prosecute and whether to approve plea agreements. See, e.g., Marsland v. First Hawaiian Bank, 70 Haw. 126, 130, 764 P.2d 1228 (1988) (County prosecutors have been delegated "primary authority and responsibility for initiating and conducting criminal prosecutions within their respective county jurisdictions."); Amemiya v. Sapienza, 63 Haw. 424, 427, 629 P.2d 1126 (1981) (stating the same principle). On appeal, the County does not dispute that holding.
 
 
 19
 Plaintiffs allege, however, that deputy prosecutor Iopa violated their constitutional rights. "Authority to make municipal policy may be ... delegated by an official who possesses such authority...." Praprotnik, 485 U.S. at 124, 108 S.Ct. 915 (citation and internal quotation marks omitted). Thus, the first question on appeal is whether Kimura (or Kimura's predecessor Ono)[2] delegated to Iopa final policymaking authority to decide whom to prosecute and whether to approve plea agreements.[3]
 
 
 20
 The Court in Praprotnik recognized that "special difficulties" arise when a plaintiff alleges that an official has delegated policymaking authority:
 
 
 21
 If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.
 
 
 22
 Id. at 126, 108 S.Ct. 915. The question therefore becomes whether the policymaker merely has delegated discretion to act, or whether it has done more by delegating final policymaking authority:
 
 
 23
 [I]f county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could rise to municipal liability.
 
 
 24
 Pembaur, 475 U.S. at 483 n. 12, 106 S.Ct. 1292 (emphasis in original); see Fiorenzo v. Nolan, 965 F.2d 348, 351 (7th Cir.1992) ("[A] municipality is not liable merely because the official who inflicted the alleged constitutional injury had the discretion to act on its behalf; rather, the official in question must possess final authority to establish municipal policy with respect to the challenged action."). In making these determinations, courts consider whether the official's discretionary decision is "constrained by policies not of that official's making" and whether the official's decision is "subject to review by the municipality's authorized policymakers." Praprotnik, 485 U.S. at 127, 108 S.Ct. 915.
 
 
 25
 Applying those principles, the court in Hyland v. Wonder, 117 F.3d 405 (9th Cir.), as amended, 127 F.3d 1135 (9th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1166, 140 L.Ed.2d 177 (1998), held that there had been a delegation of final policymaking authority. There, the San Francisco superior court judges possessed final policymaking authority over the Juvenile Probation Department. See id., 117 F.3d at 415. The superior court judges, however, "left the internal management of the Juvenile Probation Department to [the chief juvenile probation officer] and attempted not to interfere." Id. (internal quotation marks omitted). The superior court judges also "did not formulate any policy" regarding internal management of the department. Id. (internal quotation marks omitted). The delegation thus satisfied both criteria identified in Praprotnik. Not surprisingly, then, this court held that the superior court judges had delegated final policymaking authority to the chief juvenile probation officer. See id. at 415-16.
 
 
 26
 By contrast, this court has refused to hold that the Los Angeles chief of police had delegated final policymaking authority to rank-and-file police officers. See Trevino, 99 F.3d at 920 ("The police officers who shot Bahena were not 'officials with final policy-making authority' and they were not ordered to shoot by the police chief, the City Council or anyone else possessing final policy-making authority."); Los Angeles Police Protective League v. Gates, 907 F.2d 879, 882-83, 890 (9th Cir.1990) (stating a similar proposition).[4]
 
 
 27
 As will be discussed below, the delegation at issue here is unlike the delegation in Hyland. Instead, it is similar to the delegation in Trevino and Gates.
 
 
 28
 Specifically, the Hawaii charter gives the prosecutor the authority to "appoint deputies." County of Hawaii Charter § 9-4 (1991). The charter does not define the duties or powers of deputy prosecutors. Citing Okuda v. Ching, 71 Haw. 140, 785 P.2d 943 (1990) (per curiam), Plaintiffs argue that the Hawaii Supreme Court has held that deputy prosecutors possess final policymaking authority. We are not persuaded.
 
 
 29
 In Okuda, the prosecutor for the City and County of Honolulu recused himself from any involvement in the defendant's case. See id. at 142, 785 P.2d 943. Before the recusal, the prosecutor's office had appointed a private lawyer to serve as the deputy prosecutor for the case. See id. at 141-42, 785 P.2d 943. The defendant argued that, once the prosecutor had recused himself, the private lawyer could not serve as a deputy prosecutor, because the charter allowed private lawyers to try cases only under the "direction of the prosecuting attorney." Id. at 143-44, 785 P.2d 943. The Hawaii Supreme Court disagreed:
 
 
 30
 This contention founders on the rock of common sense. There is no way, given the volume of criminal cases handled by the prosecuting attorney of the City and County of Honolulu, that the prosecutor can personally supervise each and every case.
 
 
 31
 Under Charter § 8-105, the prosecuting attorney is empowered to appoint deputies, and under the provisions of Charter § 8-104, it is obvious that it is intended that those deputies may perform the functions of the prosecutor....
 
 
 32
 So also the supervision of private counsel, employed for a particular case, can be accomplished by a duly appointed deputy.
 
 
 33
 Id. at 144-45, 785 P.2d 943.
 
 
 34
 The Hawaii court's decision in Okuda establishes that deputy prosecutors have the power to perform many of the duties assigned to the prosecutor and that, in the process, they necessarily exercise broad discretion. As noted above, however, delegating discretion is not equivalent to delegating final policymaking authority. See Praprotnik, 485 U.S. at 126, 108 S.Ct. 915 ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability."). Nothing in Okuda suggests that a county prosecutor necessarily delegates final policymaking authority to deputy prosecutors; at most, Okuda holds that a county prosecutor can delegate that authority. However, the record reveals that the County Prosecutor did not choose to make such a delegation to Iopa here.
 
 
 35
 The County Prosecutor, not Iopa, created "general policies" for determining when to charge a defendant. More significantly, Iopa's immediate supervisor, Ashida, adopted policies for the initiation of felony prosecutions, including the creation of a screening process that he used to decide whom to prosecute. As part of that process, Ashida made sure that all necessary information was in a defendant's file. Based on that information, Ashida then determined whether there was admissible evidence that proved beyond a reasonable doubt that a defendant had committed the crime alleged. If there was such evidence, Ashida prepared a subpoena request form, listed all the necessary grand jury witnesses, and drafted a proposed indictment. He then assigned the case to a deputy prosecutor to present the case to the grand jury.
 
 
 36
 Ashida applied that procedure in Plaintiffs' case. He, rather than Iopa, made the initial decision to prosecute Plaintiffs. Under the screening process, deputy prosecutor Iopa then had the authority to "review [the] proposed indictment, make any changes, or contact [Ashida] if she had any concerns." If Iopa disagreed with Ashida's decision to prosecute Plaintiffs, she had to contact Ashida; she could not decide unilaterally to drop the case.
 
 
 37
 The foregoing discussion establishes that Iopa lacked final policymaking authority to initiate or terminate prosecutions. Her decision to prosecute a case was constrained by policies not of her making, and she was subject to review by the municipality's authorized policymakers.
 
 
 38
 Iopa likewise lacked final policymaking authority over plea agreements. First, the County Prosecutor, not Iopa, created standards and criteria to govern plea agreements. Second, although Iopa exercised discretion when making and negotiating plea agreements, she generally did not have authority to enter into those agreements when significant concessions were at stake: "All felony plea agreements which contemplate the reduction [or] dismissal of charges shall be approved by the First Deputy or the Prosecuting Attorney." Again, Iopa's plea agreements were constrained by policies not of her making, and her significant plea agreements were subject to review by the municipality's authorized policymakers. That being so, she lacked final policymaking authority over plea agreements.
 
 
 39
 In summary, the district court did not err by holding that Iopa lacked final policymaking authority to decide whom to prosecute and whether to approve plea agreements.
 
 B. Ratification
 
 40
 A municipality also can be liable for an isolated constitutional violation if the final policymaker "ratified" a subordinate's actions. See Praprotnik, 485 U.S. at 127, 108 S.Ct. 915. Ordinarily, ratification is a question for the jury. See Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir.1995). However, as with any jury question, a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred. See, e.g., Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir.), as amended, 125 F.3d 1281 (9th Cir.1997). The district court held that Plaintiffs could not satisfy that requirement.
 
 1. Christie
 
 41
 The district court correctly concluded that plaintiff Christie cannot establish ratification. To show ratification, a plaintiff must prove that the "authorized policymakers approve a subordinate's decision and the basis for it." Praprotnik, 485 U.S. at 127, 108 S.Ct. 915; see Gillette, 979 F.2d at 1348 (refusing to find ratification, because "[t]here is no evidence that the City manager made a deliberate choice to endorse the Fire Chief's decision and the basis for it"). Accordingly, ratification requires, among other things, knowledge of the alleged constitutional violation. See Garrison v. Burke, 165 F.3d 565, 572 n. 6 (7th Cir.1999) (holding that the municipality was not liable under § 1983, because it had no knowledge of the alleged constitutional violations); Gattis v. Brice, 136 F.3d 724, 727 (11th Cir.1998) (stating a similar proposition).
 
 
 42
 Christie provided no evidence, in conjunction with his summary judgment motion, that Kimura knew of Iopa's actions before the criminal case against him was dismissed (i.e., before the alleged constitutional violations ceased).[5] That being so, Christie has not established a genuine issue of material fact as to the question whether Kimura ratified Iopa's actions.
 
 2. Anderson
 
 43
 After Christie's case was dismissed, but while Anderson's case was still pending, both Plaintiffs filed this action against Kimura. Anderson alleged that Iopa had violated, and was continuing to violate, his constitutional rights. Filing the action thus provided Kimura with notice of Iopa's alleged ongoing constitutional violations. See Link v. Wabash R.R. Co., 370 U.S. 626, 634, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ("[E]ach party is ... considered to have notice of all facts, notice of which can be charged upon the attorney.") (citation and internal quotation marks omitted); Henry v. County of Shasta, 132 F.3d 512, 518 (9th Cir.1997) ("It is a reasonable inference--indeed, the only reasonable inference--that after Henry filed suit and successfully served process against the county, it knew about the alleged malfeasance of its employees at the jail."), as amended, 137 F.3d 1372 (9th Cir.), cert. denied, --- U.S. ----, 119 S.Ct. 59, 142 L.Ed.2d 46 (1998).
 
 
 44
 A policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification. Instead, a plaintiff must prove that the policymaker approved of the subordinate's act. For example, it is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval. See Weisbuch v. County of Los Angeles, 119 F.3d 778, 781 (9th Cir.1997) ("To hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983.") (citation and internal quotation marks omitted); Gillette, 979 F.2d at 1348 (stating the same principle).
 
 
 45
 Here, however, there is more. A rational trier of fact could conclude that Kimura affirmatively approved of Iopa's alleged ongoing constitutional violations.
 
 
 46
 First, Kimura took part in some of the plea negotiations with Anderson. According to Anderson's evidence, Kimura indicated during the negotiations that he would not prosecute anyone else in the future for possession of commercial sterilized hemp seeds. Kimura's statement, if proved at trial, permits an inference that he approved of Iopa's selective prosecution of Anderson.
 
 
 47
 Second, around that same time, Anderson's private investigator purchased commercial sterilized hemp seeds from Walmart and Miranda Country Stores, for use in Anderson's defense (to show that commercial sterilized hemp seeds are readily available in Hawaii). Kimura notified the police of the investigator's possession of hemp seeds; he did not, however, notify the police of Walmart's or Miranda's sale of hemp seeds. Again, Kimura's actions permit an inference that he approved of Iopa's selective prosecution of Anderson.
 
 
 48
 Although Kimura's actions may have an innocent explanation, on summary judgment the only question is whether a rational juror could infer a noninnocent explanation. A rational juror could infer that Kimura's acts showed affirmative agreement with Iopa's actions. In the circumstances, the district court erred by granting summary judgment to Defendants on Anderson's claim that Kimura ratified Iopa's alleged constitutional violations.
 
 C. Deliberate Indifference
 
 49
 The Supreme Court did not mention deliberate indifference as an exception to the single-incident rule in Praprotnik. After the Supreme Court decided Praprotnik, however, the Court adopted "deliberate indifference" liability and suggested that it can apply to single-incident cases. See City of Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ( "But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").[6] This court has applied this form of liability to single-incident cases. See Fuller, 47 F.3d at 1535; Hammond v. County of Madera, 859 F.2d 797, 803 (9th Cir.1988).[7]
 
 
 50
 As with ratification, a plaintiff must establish a genuine issue of material fact as to the question whether the final policymaker acted with deliberate indifference to the subordinate's constitutional violations. See Fuller, 47 F.3d at 1534-35. The district court held that Plaintiffs could not satisfy that requirement.
 
 1. Christie
 
 51
 "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown, 520 U.S. at 410, 117 S.Ct. 1382 (emphasis added) (internal quotation marks omitted); see Jensen v. City of Oxnard, 145 F.3d 1078, 1082 (9th Cir.) (stating the same principle), cert. denied, --- U.S. ----, 119 S.Ct. 540, 142 L.Ed.2d 449 (1998). There is no evidence that Kimura knew anything of Iopa's actions before the criminal case against Christie was dismissed.
 
 
 52
 In the circumstances, Christie is left to argue that Kimura's general policy of delegating discretion to deputy prosecutors obviously would result in Iopa's alleged constitutional violations. The Supreme Court has emphasized the danger of permitting liability for such a facially valid policy:
 
 
 53
 Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.
 
 
 54
 Brown, 520 U.S. at 408, 117 S.Ct. 1382.
 
 
 55
 In this action, holding the municipality liable for Kimura's general policy of delegating discretion to deputy prosecutors would be tantamount to adopting respondeat superior liability. That result is impermissible. See, e.g., Monell, 436 U.S. at 691, 98 S.Ct. 2018 ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."). The district court correctly held that, as a matter of law, Christie cannot demonstrate deliberate indifference.
 
 2. Anderson
 
 56
 Kimura obtained notice of Iopa's alleged constitutional violations when Anderson filed this action. The evidence that Anderson presented in opposition to the motion for summary judgment would permit a rational trier of fact to find that Kimura then deliberately chose to allow Iopa's constitutional violations to continue. Thus, the district court erred by holding that, as a matter of law, Anderson could not prove deliberate indifference.
 
 D. Conclusion
 
 57
 We emphasize first what we do not hold: The County is not potentially liable because Iopa was one of its employees or because Kimura delegated discretion to her. We hold only that Anderson has created a triable issue of fact on liability. He produced evidence permitting a rational trier of fact to find that Kimura, a person with final policymaking authority, knew of Iopa's alleged ongoing constitutional violations and (1) approved of those violations or (2) was deliberately indifferent to them. We therefore reverse the district court's grant of summary judgment as to Anderson.
 
 
 58
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS. Each party is to bear its own costs on appeal.
 
 
 
 [1]
 Plaintiffs later amended their complaint to also allege that Defendants interfered with their right to engage in commerce
 
 
 [2]
 When Plaintiffs were indicted, Kimura had not yet been elected County Prosecutor; he was serving as First Deputy Prosecutor (second in command)
 
 
 [3]
 In the prior appeal in this case, this court stated:
 It is unclear who other than the county prosecutor can make policy for the county in initiating prosecutions. As noted above, the county prosecutor's authority stems from the attorney general. If the attorney general does not intrude into county prosecutions, Christie and Anderson may be entitled to judgment as a matter of law that Iopa and Kimura were acting as policymakers. Because no such motion was made before the district court, however, we decline to reach that issue at this time.
 Christie v. Iopa, 121 F.3d 714, 1997 WL 429413 (9th Cir.1997) (unpublished table decision) (emphasis added); see 9th Cir. R. 36-3 (allowing the citation to an unpublished disposition when relevant as law of the case). As is apparent, the court declined to decide whether Iopa had final policymaking authority. The mere suggestion that Iopa might possess that authority does not bind us now. See Ruff v. Sullivan, 907 F.2d 915, 918 (9th Cir.1990) ("This panel is not bound by dicta from prior cases ....") (citation and internal quotation marks omitted); Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1471-73 (9th Cir.1995) (stating the same principle).
 
 
 [4]
 Plaintiffs assert that this court in Fazio v. City and County of San Francisco, 125 F.3d 1328 (9th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998), held that deputy prosecutors have policymaking authority under San Francisco's charter. However, Fazio did not purport to interpret Hawaii law. Moreover, Plaintiffs misunderstand Fazio
 This court did hold that deputy prosecutors in San Francisco are policymakers for the purpose of political patronage liability. See id. at 1333. However, the court stated that "policymaker" has a different meaning in that context:
 [T]he term policymaker as used in this context does not mean "one who makes policy. " Rather, the term refers to a position in which political considerations are "appropriate requirement[s] for the effective performance of the public office involved."
 Id. (emphasis added) (citation omitted) (alteration in original).
 
 
 [5]
 In his motion for reconsideration, Christie produced, for the first time, newspaper articles that suggested that Kimura knew of Iopa's alleged constitutional violations. However, we do not consider evidence or arguments presented for the first time in a motion for reconsideration. See Fed.R.Civ.P. 56(c) (party opposing summary judgment may serve opposing affidavits "prior to the day of hearing"); Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 59 F.3d 902, 912 (9th Cir.1995) ("A party does not properly preserve an issue for appeal by raising it for the first time in a motion for reconsideration."); Bally Export Corp. v. Balicar, Ltd., 804 F.2d 398, 404 (7th Cir.1986) ("Although the defendants attempted to raise the argument in their motion for reconsideration, a motion for reconsideration is an improper vehicle to introduce evidence previously available or to tender new legal theories.")
 
 
 [6]
 The Supreme Court in Brown assumed without deciding that single-incident liability applied to the policy at issue there. See Brown, 520 U.S. at 412, 117 S.Ct. 1382
 
 
 [7]
 In Fuller and Hammond, this court suggested that the appropriate standard for liability was either gross negligence or reckless indifference. However, after those decisions, this court has made clear that a plaintiff must prove deliberate indifference. See L.W. v. Grubbs, 92 F.3d 894, 900 (9th Cir.1996) ("We conclude that ... the plaintiff must show that the state official participated in creating a dangerous condition, and acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to it.")