**David Q. WEBB, Plaintiff–Appellee–Cross–Appellant,**

**v.**

**Darrin SLOAN, Robert Guimont, Rod Banister, Defendants,**

**and**

**Carson City, Defendant–Appellant–Cross–Appellee,**

**and**

**Does 1–10 inclusive, Defendants.**

**Nos. 01–16855, 02–16253.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 2003.*

Resubmitted April 21, 2003.

Filed May 29, 2003.

* This panel unanimously finds case No. 02–16253 suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

Mark Forsberg, Deputy District Attorney, Carson City, Nevada, for the Defendant–Appellant–Cross–Appellee.

Robert W. Story, Cooke Story, Ltd., Reno, Nevada, for the Plaintiff–Appellee; David Q. Webb, pro se, Plaintiff–Cross–Appellant.

Brent Kolvet, Thorndal, Armstrong, Delk, Balkenbush & Eisinger, Reno, Nevada, for the amicus curiae.

Before KOZINSKI, GRABER, and BERZON, Circuit Judges.

## OPINION

GRABER, Circuit Judge.

Plaintiff David Q. Webb obtained an $80,000 jury verdict in this civil rights action against Carson City, Nevada, after he was prosecuted without probable cause for obstruction of justice. His lawyers were awarded fees. In this opinion, we resolve two appeals: Defendant Carson City's appeal from the adverse verdict, and the separate appeal resulting from a challenge to the fee award by Plaintiff's counsel.

In Carson City's appeal, we hold that deputy district attorneys are final policymakers in Nevada for purposes of establishing municipal liability under 42 U.S.C. § 1983. As a result of our holding, we affirm the jury's verdict.

We reverse and remand on the appeal by Plaintiff's lawyers because the district court applied an incorrect legal standard in computing the fee.[1]

## FACTUAL AND PROCEDURAL HISTORY

### A. Facts[2]

On June 27, 1997, Deputy Darrin Sloan chased a car into the parking lot of the Carson City Inn. At the time of the pursuit, radio traffic identified the owner of

---

1. In a separate memorandum disposition, we resolve Plaintiff's cross-appeal, which challenges various rulings by the trial court.

2. "[W]ith respect to those parties in favor of whom the jury returned verdicts, we view the evidence in the light most favorable to each prevailing party." *Gilbrook v. City of West-* *minster*, 177 F.3d 839, 847–48 (9th Cir.1999). In other words, we view the facts in the light most favorable to Plaintiff as against Carson City, but in the light most favorable to Deputy Sloan as against Plaintiff.

the car as Freddy Little. The driver, who was African American, got out of the car, and Deputy Sloan continued the chase on foot. After leaping over several fences in pursuit, Deputy Sloan lost track of the suspect. He then returned to the abandoned car and began an inventory.

During the next 20 minutes or so, the police received several reports that an African American man was running through areas near the Inn. Sloan's supervisor, Sergeant Moltz, saw an African American man suddenly jump from some bushes and run through the parking lot of the *Nevada Appeal* newspaper's offices. Shortly thereafter, another officer, Deputy Guimont, found Plaintiff David Q. Webb, an African American man, lying on the ground behind a vehicle parked in an adjoining parking lot. Deputy Guimont detained Plaintiff at gunpoint and waited for Deputy Sloan's arrival.

Deputy Sloan arrived at the location where Deputy Guimont had detained Plaintiff. He noticed that Plaintiff's clothing did not match that of the man whom he had been chasing, but that Plaintiff did have a similar black bag. Sloan asked Plaintiff, "Why were you driving Freddy Little's car?" Plaintiff responded that he did not know who Freddy Little was. The deputies arrested Plaintiff for various traffic offenses and for obstructing police officers.

On July 3, 1997, another police officer told Sloan that Freddy Little had been bragging that he had outrun the cops on June 27, 1997. Either the next day or the next business day, Sloan informed District Attorney Melanie Bruketta that he no longer believed that Plaintiff was the per-son whom he had been chasing on June 27. In a supplemental report, Sloan likewise wrote that he no longer believed that Plaintiff was the person who was driving the car that he had been chasing.

Despite Sloan's timely advisement, Plaintiff was not released from jail until July 16. Nor did the district attorney's office drop any of the charges. On August 15, 1997, Plaintiff met with a deputy district attorney, Ray Oster. Oster told Plaintiff that, if he pleaded guilty to the obstruction charge, Oster would drop the traffic charges. Plaintiff refused. A week later, the district attorney's office dropped the traffic charges anyhow but proceeded with the obstruction charge.

Chief Deputy District Attorney Anne Langer took over prosecution of the obstruction charge. On September 3, 1997, Langer offered to drop the obstruction charge if Plaintiff signed a waiver of civil liability. Plaintiff again refused. In a later chance meeting, Langer assured Plaintiff that she would prosecute him to conviction on the obstruction charge. Plaintiff later testified that Langer had told his lawyer that she was prosecuting him because he refused to sign the waiver.

In October of 1997, Plaintiff went to trial on the obstruction charge. At the trial, Deputy Sloan testified that Plaintiff had done nothing to delay him in performing his duties. Deputy Guimont similarly testified that Plaintiff had not obstructed the police. Plaintiff was acquitted.

## B. *Procedural History*

Shortly after his acquittal, Plaintiff filed a complaint containing nine claims for relief under both federal and state law.[3] De-

---

**3.** Against all Defendants, Plaintiff alleged (1) a violation of his First Amendment right to seek redress from the courts, due to Langer's offer to drop the charges in exchange for a waiver of all civil claims; (2) a violation of the Fourth Amendment's prohibition against unlawful seizure, due to his arrest, imprisonment, and subsequent prosecution; (3) a general violation of Plaintiff's civil rights caused by Defendants' initiation and pursuit of prosecution without probable cause; (4) a conspir-

fendants moved for dismissal or, in the alternative, for summary judgment. The motion was denied for all claims but one. Defendants appealed, seeking review on the issue of qualified immunity. Plaintiff responded to the appeal and filed a motion to certify the appeal as frivolous. The district court denied certification, and this court dismissed the appeal for lack of jurisdiction. Plaintiff's motion for interim fees was also denied.

Plaintiff then moved for summary judgment, which was denied. The case proceeded to trial when settlement efforts failed.

The jury found in favor of Deputy Sloan on all counts, but in favor of Plaintiff as against Carson City. In special interrogatories, the jury found that Defendant Carson City had a custom, policy, or practice that violated Plaintiff's federal constitutional right not to be prosecuted without probable cause, and that Carson City has a "custom, policy, or practice to falsely imprison individuals." The jury found that Deputy Sloan did not falsely arrest Plaintiff but that Carson City falsely imprisoned, maliciously prosecuted, and committed abuse of process against Plaintiff under state law. The jury awarded Plaintiff $80,000 without apportionment among the separate claims.

Plaintiff's counsel, the law firm of Cooke Story, Ltd., moved for an award of attorney fees in the amount of $188,115.66. The district court awarded fees but determined that the total amount should be $95,507.25: $78,450 for work performed by Cooke Story and $17,057 for work performed by Plaintiff's previous lawyer, Terri Keyser–Cooper.

Carson City timely appeals the decision that municipal liability may attach for the actions of deputy district attorneys. Carson City also argues that it enjoys sovereign immunity for the discretionary decisions of district attorneys under Nevada Revised Statute ("NRS") § 41.032(2).

Cooke Story timely appeals the district court's decision to award a lower fee than it requested. Keyser Cooper does not appeal her portion of the fee award, however.

## DISCUSSION

A. *Municipal liability under § 1983 is proper in this case because the deputy district attorneys were acting as final policymakers for Carson City in deciding whether to prosecute Plaintiff.*[4]

 1. *There are two ways to establish municipal liability under § 1983, in addition to express adoption of an unconstitutional policy.*

Section 1983 provides that "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . or other proper proceeding for redress." 42 U.S.C. § 1983. "Congress intended the term 'person' to include municipalities," such as Carson City. *Christie v. Iopa*, 176 F.3d 1231, 1234 (9th Cir.1999).

Nevertheless, municipal liability under § 1983 cannot be founded on a theo-

acy to commit those federal civil rights violations; (5) false arrest, abuse of process, and malicious prosecution under state tort law; (6) intentional infliction of emotional distress; (7) a claim for "declaratory relief"; and (8) a general due process violation. Against Defen-

dants Banister and Carson City, Plaintiff alleged a failure to train officers.

4. We review de novo a district court's decision to deny immunity to a municipality in a § 1983 action. *Cortez v. County of L.A.*, 294 F.3d 1186, 1188 (9th Cir.2002).

ry of respondeat superior. *Gibson v. County of Washoe,* 290 F.3d 1175, 1185 (9th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 872, 154 L.Ed.2d 775 (2003). "Congress intended to hold municipalities liable only when 'action pursuant to official municipal policy of some nature caused a constitutional tort.' " *Christie,* 176 F.3d at 1235 (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Generally, then, the actions of individual employees can support liability against a municipality under § 1983 only if those employees were acting pursuant to an official municipal policy. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (stating that "[t]he 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality").

■ As we explained in *Christie,* a municipality still may be liable even if it does not expressly adopt the alleged policy. 176 F.3d at 1235. There are two alternative ways such liability can attach. First, if an employee commits a constitutional violation pursuant to a longstanding practice or custom, the employee's act is sufficient to support municipal liability. *Id.* By contrast, "[a] single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Id.* A municipality can be liable even for an isolated constitutional violation, however, when the person causing the violation has final policymaking authority. *Id.*

■ As to the first alternative, Plaintiff must prove the existence of a longstanding practice or policy to the satisfaction of the factfinder. *Trevino v. Gates,* 99 F.3d 911, 920 (9th Cir.1996) ("Normally, the question of whether a policy or custom exists would be a jury question."). On the other hand, when the issue concerns a single constitutional deprivation under the second alternative, the court must decide,

as a matter of state law and before the case may be submitted to the jury, whether the person who committed the violation had final policymaking authority. *Christie,* 176 F.3d at 1235.

Plaintiff argues that he proved *both* that Carson City had a longstanding practice or custom of incarcerating and prosecuting people it knows to be innocent *and* that municipal liability is proper in this case because the deputy district attorneys were acting with final policymaking authority. Because we agree with the second argument, a question that we previously left open, *Herb Hallman Chevrolet, Inc. v. Nash–Holmes,* 169 F.3d 636, 645 (9th Cir. 1999), we need not reach the first.

2. *Deputy district attorneys in Nevada have final policymaking authority for the municipality.*

■ In Nevada, the legislature confers final policymaking authority on principal prosecutors and confers that *same* authority directly on deputies. NRS § 252.070(1) provides: "All district attorneys are authorized to appoint deputies, who may transact all official business relating to the offices to the same extent as their principals."

By its plain text, that statute confers authority on deputy district attorneys that is coextensive with the authority enjoyed by principal district attorneys. Thus, if principal district attorneys are final policymakers, then so are their deputies.

Whether the principal prosecutor has final policymaking authority is easily resolved. The Nevada Constitution does not create the office of the district attorney. *Lane v. Second Judicial Dist. Court,* 104 Nev. 427, 760 P.2d 1245, 1251 (1988). Rather, the state's constitution confers the power to do so on the legislature. Nev. Const. art. 4, § 32. Pursuant to that power, the legislature statutorily created the

office and prescribed its duties. *Lane,* 760 P.2d at 1251; Nev.Rev.Stat. § 252.110. The Nevada Supreme Court has noted that "[t]he matter of the prosecution of any criminal case is within the *entire control* of the district attorney." *Cairns v. Sheriff, Clark County,* 89 Nev. 113, 508 P.2d 1015, 1017 (1973) (per curiam) (emphasis added). Thus, in Nevada, principal district attorneys "are final policymakers for the local government in a particular area, or on a particular issue." *McMillian v. Monroe County,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). Specifically, Nevada district attorneys are final policymakers in the particular area or particular issue relevant here: the decision to continue to imprison and to prosecute.

The state attorney general exercises *supervisory* power over county district attorneys, but this does not remove final policymaking authority even from principal district attorneys. As pertinent here, NRS § 228.120(2) provides that the attorney general *may:*

> Exercise supervisory powers over all district attorneys of the state in all matters pertaining to the duties of their offices, and from time to time require of them reports as to the condition of public business entrusted to their charge.

Both this court and the Nevada Supreme Court, however, have emphasized the discretionary and permissive nature of that authority. "The power to 'supervise' a district attorney which is granted to the attorney general by NRS 228.120(2), means supervision and cannot sensibly be read as a grant of power to usurp the function of the district attorney." *Ryan v. Eighth Judicial Dist. Court,* 88 Nev. 638, 503 P.2d 842, 844 (1972). " 'The tenor of these statutory provisions is that with respect to the general run of prosecutions in the various counties of Nevada the attorney general of Nevada has no duties and responsibilities. His authority concerning supervision of district attorneys is permissive and discretionary.' " *Houston v. Bryan,* 725 F.2d 516, 519 (9th Cir.1984) (quoting with approval the district court's decision below). In the light of these authorities, and in the absence of any evidence in the record that the attorney general in fact ever exercises that supervisory power, we hold that principal district attorneys are final policymakers for the municipality with respect to the conduct of criminal prosecutions.

As previously stated, the Nevada legislature confers the same final policymaking authority on deputy district attorneys. Nev.Rev.Stat. § 252.070(1). The principal does not delegate constrained discretion to a deputy upon appointment. Rather, the legislature states that, upon appointment, deputies may transact all official duties *to the same extent as* their principals.

We are mindful that the Nevada statutory text is permissive, not mandatory: Deputies *may* transact official business to the same extent as their principals. Conceivably, the principal prosecutor could constrain that authority. That possibility does not change our analysis, because Carson City presented no evidence that its principal district attorney actually has constrained the deputies' authority. In fact, Carson City presented evidence to the contrary.

In *Christie,* we held that deputy prosecutors in Hawaii did not have final policymaking authority, a holding on which Carson City relies. 176 F.3d at 1237–38. That case is distinguishable in fundamental ways, however.

There, it was clear that the chief prosecutor had final policymaking authority. *Id.* at 1238. The Hawaii charter gave principal prosecutors the authority to appoint deputies, but did not describe the authority that those deputies would enjoy to make decisions or to choose among al-

ternatives. *Id.* at 1237. Accordingly, *Christie* framed the question as whether the chief prosecutor had delegated that authority to deputy prosecutors. *Id.* at 1236. That was a hard question, because to avoid imposing respondeat superior liability we had to ascertain the precise degree to which a principal delegates authority. *Id.* Here, however, the legislature directly delegates coextensive authority to the principal prosecutor and the deputies.

In *Christie*, we found it significant that "[i]f [the deputy prosecutor] disagreed with [the principal prosecutor's] decision to prosecute Plaintiffs, she had to contact[the principal prosecutor]; she could not decide unilaterally to drop the case." *Id.* at 1238. By contrast, Carson City presented affirmative evidence that any deputy in the office could have made the decision to dismiss the charges against Plaintiff without consulting with any supervisor.

 Because of the distinctions between Nevada's deputy district attorneys and the Hawaiian deputy prosecutors in *Christie*, *Christie* does not control the outcome of this case. The district court correctly held that deputy district attorneys in Nevada are final policymakers whose actions can be the acts of the municipality for the purposes of attaching liability under § 1983.[5]

B. *We need not reach Carson City's state-law immunity claim because the verdict can rest on a valid federal ground.*

 Citing NRS § 41.032(2), Carson City argues that deputy district attorneys

enjoy immunity for their discretionary acts. We need not reach this issue. If the immunity defense is viable, then the state claims were submitted to the jury in error. The federal claims, however, remained valid.

 Sometimes, a jury's verdict may stand on a legally viable theory even if a legally defective theory also was presented. As explained in *Portland Feminist Women's Health Center v. Advocates for Life, Inc.,* 62 F.3d 280, 285–86 (9th Cir.1995):

Our analysis of the viability of the plaintiff's theories ... leaves us with a situation in which one of the theories submitted to the jury was legally defective. "As a general rule, 'a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury.'" *Kern v. Levolor Lorentzen, Inc.,* 899 F.2d 772, 777 (9th Cir.1990) (quoting *Syufy Enters. v. American Multicinema, Inc.,* 793 F.2d 990, 1001 (9th Cir. 1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830, *and cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 838 (1987)). An exception to this rule exists, however, when we are able to construe a general verdict as attributable to a theory submitted to the jury that was viable.... In deciding whether to exercise this discretion, the factors we consider are: "(1) the potential for confusion of the jury; (2) whether the losing party's defenses apply to the count upon which the verdict is be-

---

**5.** The Nevada Public Agency Insurance Pool, as amicus, argues that this holding will expose Nevada's municipalities to heavy liability. The same statutory text gives co-extensive authority to deputy county recorders, deputy county clerks, and deputy county assessors. We are not persuaded that our holding will have the crushing effect that amicus urges. First, our holding does not address whether the principals who hold those other positions are final policymakers for municipalities. If a county recorder is not a final policymaker, then a deputy county recorder exercising coextensive authority is not a final policymaker. Second, it is within the Nevada legislature's power to constrain the authority of deputies if it should see fit.

ing sustained; (3) the strength of the evidence supporting the count relied upon to sustain the verdict; and (4) the extent to which the same disputed issues of fact apply to the various legal theories." *Id.* (citing *Traver v. Meshriy*, 627 F.2d 934, 938–39 (9th Cir.1980)). (Parallel citations omitted.)

A consideration of the relevant factors in this case weighs in favor of affirming the full jury award on federal grounds:

First, the verdict eliminates any concern about jury confusion. Instead of the general verdict entered in *Portland Feminist*, the jury answered special interrogatories explaining on which theories it found in Plaintiff's favor and on which it did not. The special interrogatories identify which answers refer to the federal claims and which refer to the state claims. Because of the special interrogatories, there is no danger that the jury found liability *only* on a legally defective theory. The only aspect of the verdict that is "general" is the damages award, which was not apportioned among the claims.

Second, the defense of sovereign immunity under NRS § 41.032(2) applies only to the state-law claims, not the federal claims. Thus, there is a clear delineation between the legally viable theories and the theories that we assume to be legally infirm.

The third and fourth factors are related, and both weigh in favor of affirming the full award. The evidence is certainly strong enough to support the jury's reasonable damages award based solely on the federal claims. Furthermore, the evidence supporting the federal and state claims was the same. The state claims were simply another means of seeking redress for the same injuries that arose out of the same common core of facts.

Application of these four factors persuades us that the verdict here is distinguishable from the one in *Portland Feminist*. The special interrogatories provide a sufficient record to allow us to affirm the verdict even if Carson City can claim immunity for the state-law claims.

C. *The district court applied an incorrect legal standard and, as a consequence, excluded related claims in computing the fee.*[6]

 Under 42 U.S.C. § 1988, the district court may, in its discretion, award attorney fees to a prevailing party in an action brought under § 1983. The district court agreed that Plaintiff was a prevailing party, but awarded less than Cooke Story had requested. The court reduced the fee award for three reasons. *First*, it excluded time spent on three motions that Plaintiff did not win: a motion to certify as frivolous Defendants' interlocutory appeal of the court's qualified immunity decision, a motion for interim fees, and a motion for partial summary judgment. *Second*, the court reduced the number of hours by 25 percent to reflect Plaintiff's limited success. *Third*, after concluding that counsel spent too much time challenging Defendants' interlocutory appeal, the court reduced the number of hours for which fees would be awarded on that issue. Although the district court did not err in applying the second step in *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), when it made the second and third adjustments, *see infra* p. 1169, we reverse and remand the fee award because the district court used an incorrect legal standard in deciding what issues were "unrelated" to the successful claims.

---

6. We review for abuse of discretion a district court's decision to award fees to a prevailing party in a civil rights action. *Hensley v. Eck-* *erhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

 "[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees" under § 1988. *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933. As we explained in *Sorenson v. Mink,* 239 F.3d 1140, 1147 (9th Cir.2001), there is a two-step process for determining the appropriate reduction for "limited success":

> The first step is to consider whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded." [*Hensley,* 461 U.S.] at 434, 103 S.Ct. 1933. Claims are "unrelated" if they are "entirely distinct and separate" from the claims on which the plaintiff prevailed. *Odima [v. Westin Tucson Hotel,* 53 F.3d 1484, 1499 (9th Cir.1995)]. Hours expended on unrelated, unsuccessful claims should not be included in an award of fees.
>
> . . . .
>
> The second step of the *Hensley* analysis is to consider whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." [461 U.S.] at 434, 103 S.Ct. 1933. In answering that question, a district court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435, 103 S.Ct. 1933. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* A plaintiff may obtain excellent results without receiving all the relief requested. *Id.* at 435 n. 11, 103 S.Ct. 1933.

(Parallel citations omitted.) The district court reduced the Plaintiff's fee at both steps of this two-step analysis.

 At the first step, the court determined which claims had succeeded and which claims had failed. The court noted that Plaintiff was unsuccessful on his claims for false arrest and failure to train. The court nonetheless allowed fees for work done on those two claims because it found them related to the claims on which Plaintiff did prevail. In this respect, the court did not err.

The court also relied on the fact that "Plaintiff was unsuccessful on his motion to certify the appeal as frivolous, his claim for interim attorney's fees, and his motion for summary judgment." The court deducted the hours that Cooke Story claimed were spent preparing for those portions of the case. The court erred in analyzing whether those three motions were "unrelated" to the claims on which Plaintiff ultimately prevailed.

 The district court erred because it misconstrued our precedents when it applied a strict two-step test—(1) are there common facts *and* (2) are there related legal theories—to determine the relatedness of claims. We do apply a two-step test to determine how to reduce an award for limited success, but we have not adopted a similar test for relatedness. Echoing the Supreme Court's description of related-claim cases, we have said that related claims involve a common core of facts *or* are based on related legal theories. *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933; *Cabrales v. County of L.A.,* 864 F.2d 1454, 1465 (9th Cir.1988), *vacated,* 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989), and *reinstated,* 886 F.2d 235 (9th Cir.1989). Often, related claims involve both a common core of facts and related legal theories. *See, e.g., Sorenson,* 239 F.3d at 1147. However, contrary to the district court's understanding, we have not *required* commonality of both facts *and* law before concluding that unsuccessful and successful claims are related.

In *Schwarz v. Secretary of Health & Human Services,* 73 F.3d 895, 902–03 (9th Cir.1995), we examined our cases concern-

ing "relatedness" in fee awards. We acknowledged that the test for relatedness of claims is not precise. *Id.* at 903. However, we offered some guidance, explaining that "the focus is to be on whether the unsuccessful and successful claims arose out of the same 'course of conduct.' If they didn't, they are unrelated under *Hensley.*" *Id.* We explained that claims are *unrelated* if the successful and unsuccessful claims are "distinctly different" *both* legally *and* factually. *Id.* at 901, 902. Again echoing *Hensley,* we reasoned that such hours are excludable because work on such distinctly different claims "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.' " *Id.* at 901 (quoting *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 (internal quotation marks omitted)). We cited cases in which we asked "whether it is likely that some of the work performed in connection with the unsuccessful claim also aided the work done on the merits of the successful claim." *Id.* at 903 (brackets and internal quotation marks omitted). Ultimately, however, we reaffirmed that the focus is on whether the claims arose out of a common course of conduct. *Id.* In short, claims may be related if either the facts *or* the legal theories are the same.

Plaintiff asserted numerous legal theories against several defendants. However, all his claims arose out of a common core of facts and a common course of conduct: Plaintiff's arrest, detention, and prosecution. In such a situation, we cannot say that the claims the district court excluded were "entirely distinct and separate" from the successful claims. *Sorenson,* 239 F.3d at 1147 (internal quotation marks omitted).

For example, Plaintiff's motion for summary judgment, although unsuccessful, was not wholly unrelated to the claims on which he succeeded. Plaintiff sought summary judgment on his federal and state claims for false arrest, false imprisonment, and malicious prosecution. Plaintiff ultimately prevailed on his false imprisonment and malicious prosecution claims. As the district court itself concluded, the claim for false arrest is unquestionably related to the two successful claims. Even though the summary judgment motion failed, work done to prepare the motion on those theories could have contributed to the final result achieved. In other words, the district court should not have excluded all work on the motion on the ground that it was "unrelated."

To be sure, at least one claim in the summary judgment motion asserted a separate legal theory that was not tied to the facts. Plaintiff claimed that the obstruction statute facially violated the First Amendment because of its overbreadth. The hours spent preparing that claim properly may be excluded. However, the district court should exclude the hours spent on that claim only if those hours can be isolated. *Hensley* recognized that work on different aspects of a case often overlaps, and that "[m]uch of counsel's time will be devoted generally to the litigation as a whole." 461 U.S. at 435, 103 S.Ct. 1933. If it is impossible to isolate the truly unrelated claims from those related claims, the district court should instead reflect that limited success in *Hensley's* second step: the significance of the overall relief in relation to the hours reasonably expended on the litigation. *Sorenson,* 239 F.3d at 1147.

As for *Hensley's* second step, the district court applied the proper analysis. Plaintiff initially sued several defendants, but prevailed against only one: Carson City. A discretionary reduction to reflect that kind of limited success is appropriate. *See Corder v. Gates,* 947 F.2d 374, 379–80 (9th Cir.1991) (stating that a full-fee award to a plaintiff who prevails against only one among many defendants encourages litiga-

tion in a manner that Congress did not intend).

 In addition, on the ground that the billing was excessive, the court reduced by half the 71.5 hours that Cooke Story claimed it took to prepare a motion to dismiss Defendants' interlocutory appeal. This was the same appeal that Cooke Story claimed below should be certified as frivolous. The district court apparently agreed that the issue demanded little of counsel's time. The court did not abuse its discretion in making this reduction.

We recognize that a reduction in the requested fees is appropriate in view of Plaintiff's limited success and the court's conclusion that some of the hours billed were excessive. Because the district court applied the wrong standard for relatedness, however, we must reverse and remand so that the court may reexamine Cooke Story's fee application in view of the correct legal standard.[7]

AFFIRMED in case No. 01–16855. REVERSED and REMANDED in case No. 02–16253.

---

7. We note again that Keyser Cooper does not appeal her portion of the fee award, so that award should remain unchanged.