Jane DOE, Plaintiff,

v.

CITY OF SAN DIEGO,
et al., Defendants.

Case No. 12–cv–689–MMA–DHB.

United States District Court,
S.D. California.

Signed April 1, 2014.

Browne Greene, Greene, Broillet &
Wheeler LLP, Santa Monica, CA, Linda G.

Workman, Joseph Gary Dicks, Dicks and Workman APC, San Diego, CA, Andrew J. Spielberger, Daniel K. Balaban, Balaban & Spielberger LLP, Los Angeles, CA, Holly N. Boyer, Esner, Chang & Boyer, Pasadena, CA, for Plaintiff.

Christina M. Milligan, Keith W. Phillips, Donald F. Shanahan, Office of the City Attorney, Michelle Landis Gearhart, Mitchell D. Dean, Daley & Heft LLP, San Diego, CA, Kevin M. Osterberg, Haight Brown and Bonesteel LLP, Riverside, CA, for Defendants.

## ORDER DENYING DEFENDANT CITY OF SAN DIEGO'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 201]

MICHAEL M. ANELLO, District Judge.

This action arises out of a March 8, 2011 incident in which Plaintiff Jane Doe ("Plaintiff" or "Doe") was sexually assaulted and battered by San Diego Police Department Officer Anthony Arevalos. Plaintiff, in part, seeks relief under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In the present motion, Defendant City of San Diego (the "City") moves for summary judgment on Plaintiff's *Monell* claim. [Doc. No. 201.] On February 24, 2014, the Court issued a tentative ruling denying the City's motion. Thereafter, the Court held a hearing on the matter. Upon consideration of the comprehensive record before the Court, including the written and oral arguments of counsel, the Court **AFFIRMS** its tentative ruling and **DENIES** the City's summary judgment motion. The Court's ruling today expresses no opinion as to the merits of Plaintiff's *Mo-nell* claim; rather, it permits Plaintiff to present her claim to a jury as a contested question of fact.

### BACKGROUND [1]

Anthony Arevalos served as a police officer for the San Diego Police Department for nearly twenty years. On paper—in particular, his police personnel file—he was a standout officer; in practice, he was nothing but. Indeed, Arevalos' tenure with the SDPD included numerous complaints of sexual misconduct and other deviant behavior. Yet, despite repeated instances of misconduct, Arevalos' conduct went largely undocumented and was only minimally disciplined.

The City contends that Arevalos was a rogue officer who acted alone in his base behavior, and that the SDPD could not have known that he would sexually assault and batter a female arrestee. Plaintiff, however, paints a darker scene. She contends that the SDPD engages in a custom of condoning sexual and other serious misconduct by officers, and that a pervasive code of silence prevents officer misconduct from being discovered, investigated, and appropriately resolved. Accordingly, Plaintiff contends the City should be held liable for her injuries. The Court will outline the factual predicate for Plaintiff's claim and existing factual disputes in the discussion that follows.

### EVIDENTIARY OBJECTIONS

The City of San Diego contends that the vast majority of evidence Plaintiff produces to support her opposition is inadmissible. The Court finds that many of the City's objections are well taken. In particular, Plaintiff has improperly supported her statement of facts by citing to the factual statements set forth by her expert witnesses in their reports rather

---

1. The facts of this case have been recounted at length in previous orders and will not be repeated here except as necessary to explain the Court's ruling.

than citing to facts in the record. This is improper: "The law is clear ... that an expert report cannot be used to prove the existence of facts set forth therein." *In re Citric Acid Litigation,* 191 F.3d 1090, 1102 (9th Cir.1999). Thus, to the extent Plaintiff relies solely on the expert reports to support her factual statement, the Court **SUSTAINS** Defendants' objection.[2] Additionally, the Court **SUSTAINS** Defendants' objections to Plaintiff's exhibits WW, YY, CCC, DDD, HHH through RRR, UUU, AAAA, CCCC, DDDD, KKKK, TTTT, UUUU, WWWW, XXXX, YYYY, and the declaration of "DB," attached to Linda Workman's supplemental declaration filed February 20, 2014. These exhibits either contain inadmissible hearsay, were not properly authenticated, are irrelevant, or were untimely filed.

All evidentiary objections not referenced herein are either overruled,[3] or the evidence in question was not material to the resolution of this motion, rendering the objections moot.

### LEGAL STANDARD

▉ A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to inter-

rogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

▉ If the moving party meets its initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When a party fails to properly address another party's assertions of fact, a court may consider these facts as undisputed. Fed. R.Civ.P. 56(e)(2). If the motion and supporting materials, including facts considered undisputed, show the movant is entitled to summary judgment, the Court may grant the motion. · Fed.R.Civ.P. 56(e)(3). Summary judgment is not appropriate if the non-moving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir.1991). However, "[w]here the record taken as a whole could not lead a rational trier of fact to

---

**2.** The Court notes, however, that the majority of the facts cited within the expert reports are contained in admissible form elsewhere in the voluminous record before the Court.

**3.** For example, the Court overrules many of the City's hearsay objections pursuant to Federal Rule of Evidence 801(d)(2), which pro-

vides that an admission by a party-opponent is not hearsay. An admission by a party-opponent includes "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D).

find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## DISCUSSION

The City moves for summary judgment on the ground that Plaintiff's evidence fails to raise a triable issue of fact that would allow a reasonable jury to find that Plaintiff has proven her *Monell* claim.

## I. *Monell* Claims Under 42 U.S.C. § 1983

 Title 42 U.S.C. § 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

 Municipalities cannot be held vicariously liable under section 1983 for the actions of their employees. *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018.

 To impose liability on a government entity, a plaintiff must show that "the municipality itself causes the constitu-, tional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Ulrich v. City & County*

*of San Francisco,* 308 F.3d 968, 984 (9th Cir.2002) (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). The asserted policy or custom need not be unconstitutional per se; it need only cause the constitutional violation. *Jackson v. Gates,* 975 F.2d 648, 654 (9th Cir.1992).

 The parties dispute whether Plaintiff also must show that the City was "deliberately indifferent" to her constitutional rights. Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board . of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The Ninth Circuit applies a "deliberate indifference" requirement in order to find liability in "single incident cases," such as where a municipal employee applies a facially permissible policy in an unconstitutional manner. *Christie v. Iopa,* 176 F.3d 1231, 1240 (9th Cir.1999) (citations omitted). Moreover, the Ninth Circuit requires "deliberate indifference" for *Monell* claims alleging liability based on a policy of failure to train. *See* 9th Cir. Model Civ. Jury Instr. 9.7.

 In contrast, where a plaintiff claims that a particular municipal action in itself violates or directs employees to violate federal law, there is no "'state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Brown,* 520 U.S. at 404–05, 117 S.Ct. 1382 (quoting *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The stringent deliberate indifference standard is a response to the "danger of permitting liability for … a facially valid policy." *Christie,* 176 F.3d at 1241. As the Supreme Court explained,

Where a claim of municipal liability rests on a single decision, not itself represent-

ing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.

*Brown,* 520 U.S. at 408, 117 S.Ct. 1382.

Here, Plaintiff's theory of municipal liability rests on her assertion that the SDPD followed a practice that itself was unconstitutional. For the reasons described below, the existence of such a practice is a disputed issue of fact. If Plaintiff succeeds in proving the existence of such a practice, then she need not prove that the City acted with deliberate indifference to her constitutional rights.

## A. City Policy, Regulation, Custom, or Usage

 It is undisputed that Plaintiff suffered a constitutional deprivation. The primary source of dispute is whether Plaintiff has produced sufficient evidence from which a reasonable jury could conclude that the City is liable under section 1983 for her deprivation. To meet her burden of establishing a policy, regulation, custom, or usage that caused her constitutional deprivation, Plaintiff asserts that SDPD officers participate in a "code of silence,"—amounting to a custom— whereby officers protect each other from investigation and consequences of their wrongdoing. According to Plaintiff, the

SDPD's failures to report misconduct, appropriately discipline misbehaving officers, and *de facto* policy where officers cover up, interfere with, and impede misconduct investigations, created an environment where officers like Arevalos could act with impunity, and where instances of sexual misconduct against females were commonplace. "While aware of his sexually deviant tendencies and long history of unbridled prior misconduct, the SDPD did nothing to prevent Officer Arevalos from abusing his official authority." [Pl's Opp. Brief at 2.]

 A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Proof of random acts or isolated events is insufficient to establish custom. *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1444 (9th Cir.1989). But a plaintiff may prove "the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir.1992). Once such a showing is made, a municipality may be liable for its custom "irrespective of whether official policy-makers had actual knowledge of the practice at issue." *Thompson,* 885 F.2d at 1444.

While the City implicitly acknowledges that a "code of silence" may qualify as a type of custom able to invoke *Monell* liability, the City contends that Plaintiff has not sufficiently demonstrated that the SDPD abides by one. Instead, the City contends that Plaintiff's claim is "premised solely on conclusions and assumptions using 20/20 hindsight." [Mot. at 1, Doc. No.

201–1.] The City argues that Arevalos was a rogue officer who acted alone, and that the SDPD had no evidence to suggest that Arevalos would sexually assault Plaintiff. [*Id.*] According to the City, "Plaintiff's theories are cobbled together by use of isolated incidents, conclusory opinions and opinions based upon non-existent or inadmissible facts. Plaintiff point[s] to events which have no relationship to one another and clearly fail to prove a City custom or policy that amounts to a widespread and longstanding practice." [*Id.* at 7–8.]

In considering whether triable issues of fact remain, the Court disagrees. Plaintiff has presented sufficient evidence of a code of silence that exists within the SDPD, and which could constitute the moving force behind her constitutional injuries. Specifically, Plaintiff presents: (1) evidence of Arevalos' tenure with the SDPD, during which numerous bad acts went undocumented and largely undisciplined; (2) testimony from former police officers acknowledging the code of silence; (3) expert testimony opining as to the existence and scope of a code of silence. In light of this evidence, the Court finds that there are genuine issues of fact material to the resolution of Plaintiff's claim.

**1. Arevalos' Tenure with the SDPD**

▮ The Court has previously outlined Arevalos' tumultuous history as a police officer within the SDPD. The history shows that Arevalos survived for over 15 years within the department, despite numerous complaints of sexual misconduct and other deviant behavior. Despite the repeated instances of misconduct, Areva-

los' behavior was only minimally disciplined and documented. Ultimately, Arevalos was criminally convicted for his on-duty elicit behavior towards four women in addition to Jane Doe.[4] Several other allegations of sexual misconduct were reported but did not become part of the criminal trial. The following is a brief overview of the past incidents involving Arevalos which Plaintiff contends serve as proof of the code of silence.[5]

1. 5150 Detainee—In the late 1990's, SDPD Officer Francisco Torres reported that Officer Arevalos had sexually assaulted and photographed a nude 5150 detainee with Arevalos' baton in her vagina. Officer Torres reported the incident to Arevalos' supervisors, who gave Arevalos a "verbal reprimand" for his actions, but did not otherwise document the incident. Later, Arevalos allegedly confronted Officer Torres for reporting the incident, stating "what happens in the field stays in the field."

2. Susy S.—Ms. S. alleges that in 2001, upon pulling her over in his police car, Officer Arevalos grabbed her and forcefully pushed her against her vehicle. Ms. S. contends that she could feel Officer Arevalos push his groin area into her, and that he grabbed her breast. Ms. S. states she called the police department the next day to report Arevalos, and that she later met with Police Chief David Bejarano, who told her that everything was taken care of. Arevalos was apparently never disciplined or investigated for this incident.

3. MP—In July 2007, sixteen-year-old MP, wearing a bathing suit covered by a top, was pulled over by Officer Arevalos.

---

4. Jeannie E., Melissa W., Melissa M., and Melissa R.

5. Plaintiff attempts to also invoke incidents involving Melissa R. and Marjan M. However; only evidence of these incidents comes in the

form of testimony from Arevalos; criminal trial. This evidence is inadmissible hearsay, and, thus, the Court does not rely on these incidents in its analysis of whether a code of silence exists.

Arevalos told her that her license plate tags were about to expire, and required her to exit the vehicle to look at the tags. Once behind the vehicle, Officer Arevalos told MP to "bend over" to look at the tags. Officer Arevalos was standing behind MP as she did so, and MP states that Arevalos was "really weird and uncomfortable."[6] The incident was reported directly to Arevalos' supervisors. However, Officer Arevalos was not disciplined for this incident.

4. Jane Roe—In February 2010, Jane Roe reported that Officer Arevalos inserted a gloved hand inside her vagina while en route to Las Colinas Women's Detention Center. Arevalos was investigated, but was ultimately cleared and returned to patrol. The City claims that Roe's complaint was properly handled. Plaintiff, however, contends that the investigation was flawed from the outset. For instance, Plaintiff produces evidence which tends to demonstrate that Roe's rape examination was improperly delayed, rendering the exam inconclusive. [*See, e.g.*, Daniel Cerar Dep. at 70–71, Doc. No. 217–3.] Moreover, while the investigation turned up several incriminating facts—including that the automatic vehicle locator ("AVL") system on Arevalos' patrol car showed he parked his car for one minute and twenty-nine seconds while transporting Roe, and that blue latex gloves, similar to gloves issued to SDPD officers, were found at the location where the AVL indicated he had stopped—neither the investigation unit nor Arevalos' supervisor confronted him with these facts.

█ In addition to the actual claims of misconduct, Officer Arevalos had built a reputation on the police force for his suspect behavior towards female arrestees. He was known as the "Las Colinas Transport Unit" because of the number of runs he would take to Las Colinas Women's Detention Facility. He consistently bragged about stopping "beautiful girls." In the words of one police officer, Arevalos "appeared to be a profiler of hot women." [Henry Castro Statement, Ex. B–1 at 632.][7] "At the end of the shift, [Arevalos] would show other officers the driver's license photo[s] of women he arrested. It pumped him up." [*Id.* at 633.] "[Arevalos] is the only guy in Traffic Division that had a nude magazine in his locker." [*Id.*] "[Arevalos] would come in and tell stores about women and what they would do. . . . Tony had more stories than anybody." [Brian Keaton Statement, Ex. B–1 at 634.] "I think he enjoyed having a reputation." [*Id.*] One officer told Arevalos he was "playing with fire" and that if he was purposefully seeking to arrest good looking females he should "knock it off." [Bob Wells Statement, Ex. B–1 at 635.][8] Are-

---

**6.** As discussed in the Court's Order Granting the Supervisor Defendants' motion for summary judgment [Doc. No. 330], this incident cannot truly be seen as egregious sexual misconduct. Nonetheless, the City's response to the incident, including whether it documented the incident, remains relevant to the question of whether a code of silence exists.

**7.** The Court notes that Exhibit B–1 and other exhibits cited herein are currently filed under seal pursuant to the protective order entered in this case. Thus, the Court refrains from citing the confidential portions of these documents, and otherwise strives to maintain inviolate their confidential nature.

**8.** The City objects to the admissibility of Exhibits B–1 through B–14. Each of these documents was developed by the SDPD during the investigation of Arevalos, and contain the statements of San Diego Police Officers or statements of Arevalos himself. Under Federal Rule of Evidence–801(d)(2), an admission by a party-opponent is not hearsay. An admission by a party-opponent includes "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). Thus, the City's objections to these exhibits are **OVERRULED.**

valos referred to himself as the "Teflon Don" because no allegations could ever stick to him. [Torres Dep. at 79, Ex. XX.]

Despite all of Arevalos' problematic behavior, his personnel file contains only documentation of inappropriate computer use, and no other documentation of misconduct. [*See* Arevalos Personnel File, Ex. LLLL.] According to Plaintiff's expert Jeffrey Noble, "[a]nyone who reviewed Officer Arevalos' personnel file would be of the opinion that Officer Arevalos was a hard-working, competent, veteran San Diego police officer and with the exception of two minor disciplinary actions that Officer Arevalos was among SDPD's best and brightest." [Noble Report ¶ 149.]

### 2. The "Code of Silence" Acknowledged by SDPD Officers

Plaintiff also provides testimonial evidence from former SDPD police officers regarding the existence of a "code of silence" within the SDPD.

Former SDPD Officer Arthur Perea testified to observing a code of silence within the SDPD. He stated that "a lot of misconduct" is "kept within the department, and many times swept under the rug, depending on who you are and what your position is on the police department." [Perea Dep. at 28–29, Ex. BB.]

Officer Arevalos testified that he had seen the code of silence "with [his] own eyes." [Arevalos Dep. at 240, Ex. R.] He testified that he saw "captains get stopped for DUIs," only to be "driven home" for fear of retaliation. [*Id.*]

Former SDPD Officer Francisco Torres noted the unwritten rule that "what happens in the field stays in the field, and it's never brought up or—you know, you don't

bring charges up against a fellow officer." [Torres Dep. at 151, Ex. XX.]

### 3. Expert Testimony

Plaintiff also offers expert testimony to support her claim regarding the "code of silence" within the SPPD. Jeffrey Noble's [9] expert testimony includes the following opinions:

- In any police agency, there may be anecdotal evidence of a code of silence among individual officers that does not amount to an unwritten policy, practice or custom within the agency itself. However, in this case there is significant evidence of a strong, active and pervasive code of silence that is designed and practiced to prevent officer misconduct from being discovered, investigated and appropriately resolved.

- There is evidence of a pervasive, widespread, policy, custom and practice within the SDPD of engaging in the code of silence to protect fellow officers from investigations and consequences of their wrongdoing, allowing officers to reasonably believe that they can violate the constitutional rights of others with impunity.

- While it is possible in any police agency for an individual unprincipled police officer to engage in a code of silence to protect another police officer, the evidence in this matter is that the code of silence within the SDPD is pervasive, widespread, pattern and practice where police officers are taught the code early in their career and they live by the code throughout their careers. Unquestionably, absent the code of silence, the predatory nature of Officer Arevalos to prey on vulnerable members of the San Diego community

---

9. Mr. Noble was a police officer for 28 years before retiring in Jul 2012 as the Deputy Chief of Police with the Irvine Police Department. The City does not seek to exclude Mr. Noble's testimony under Federal Rule of Evidence 702.

would have reported, investigated, and resolved long before Officer Arevalos had the opportunity to victimize Ms. Doe. Moreover, the evidence of the code of silence is so strong within the SDPD that a reasonable police officer would believe that they could violate the constitutional rights of others with impunity.

- In a four year period, the SDPD reported that only four Category I allegations based on community member complaints were sustained. The fact that only four allegations of misconduct were sustained over four years for a department with 1,200 officers is concerning. Such a low number of sustained complaints could mean that the officers of the SDPD are extraordinarily well behaved and they are performing their duties appropriately, or that the SDPD has systemic issues in their complaint and investigatory processes that makes it nearly impossible for an officer to be held accountable for their misconduct.

- The complaint acceptance procedure of the SDPD is unreasonable as it does not mandate the acceptance and documentation of all complaints[.] [It] does not address complaints made by third parties, juveniles, intoxicated individuals, or due to civil lawsuits, and most importantly because it allows field supervisors unfettered discretion to dissuade, ignore or refuse to accept allegations of officer misconduct without any investigation or documentation.

[Noble Report, ¶¶ 155–57, 163, 185.]

Another expert retained by Plaintiff, Dr. Robert Taylor,[10] opines:

- The [SDPD] promotes patterns and practices that rise to the force of poli-

cy that serve to mask and/or cover-up allegations of sexual misconduct. These patterns and practices include both the inappropriate categorization of sexual misconduct complaints and the case of Anthony Arevalos' 2008 reprimand that stemmed from the inappropriate use of his city-issued work computer to access a pornographic website.

- The specific cases enumerated early in this report collectively describe the promotion of a code of silence and inaction on the part of the San Diego Police Department middle managers, administrators and executives confronted with complaints of sexual misconduct.

- The case not only makes clear that the victims were not "mistaken," but that Officer Arevalos should not have been a police officer-most assuredly by the time that Jane Doe was stopped. Arevalos counted on the protection provided by his superiors and the administration of the SDPD that allowed him to repeatedly talk, harass, and/or sexually assault female drivers for almost two decades.

[Taylor Report, ¶¶ 59, 73, 92.]

### 4. SDPD Policies Regarding Reporting Officer Misconduct

Plaintiff's expert Jeffrey Noble reviewed the SDPD's written policies and procedures regarding the reporting of officer misconduct. He opines that "the San Diego Police Department has generally enacted reasonable policies and procedures designed to establish consistent work standards and to regulate the behav-

---

**10.** Dr. Taylor is currently a Professor of Criminology at the University of Texas at Dallas. He formerly chaired the Department of Crim- inal Justice at the University of North Texas. The City does not seek to exclude his testimony under Federal Rule of Evidence 702.

ior of their employees." [Noble Report ¶ 158.] However, Mr. Noble states that while the "codes of conduct that are covered within the SDPD's policy manual generally conform with reasonable practices, the SDPD does not have a mandatory reporting policy, nor does it have a retaliation policy protecting those who report misconduct." [*Id.* ¶ 159.] Noble opines that:

> Mandato reporting policies are one method to address the code of silence. These policies make clear that the control of serious misconduct by employees is not just the responsibility of supervisors and managers rather, it is a shared responsibility among all officers, supervisors, and managers. A reasonable policy would clearly state that an officer has an affirmative duty to report serious wrongdoing and that officers who fail to report serious acts of misconduct may themselves be subject to disciplinary or other corrective action. By developing a policy of this manner, it removes the stigma from reporting misconduct by making it an affirmative obligation of all employees.

[*Id.* ¶ 159(b).]

In his deposition, former Chief William Lansdowne agreed that a mandatory reporting policy is important because it creates an atmosphere where officers feel comfortable reporting other officer misconduct, and it is necessary for maintaining a professional and honest police department. [Lansdowne Dep., Ex. AA at 25.] Lansdowne was previously chief of police in San Jose and Richmond, California. Both of those police departments had mandatory reporting and no-retaliation policies. Lansdowne "thinks" that the SDPD has similar policies, but he has never personally read it. [*Id.* at 63.] According to Mr. Noble, however, there is no evidence that the SDPD has mandatory reporting and anti-retaliation policies. [Noble Report ¶¶ 159(b), (d).]

Mr. Noble also opines that the SDPD's policies and procedures for accepting and investigating citizen complaints are suspect. He states that "[t]he complaint acceptance procedure of the SDPD is unreasonable as it does not mandate the acceptance and documentation of all complaints, ... and most importantly because it allows field supervisors unfettered discretion to dissuade, ignore or refuse to accept allegations of officer misconduct without any investigation or documentation." [*Id.* ¶ 163.] "This type of policy allows for legitimate complaints to be sheltered from upper management, avoids investigations and protects officers from allegations of misconduct." [*Id.* ¶ 162(a).]

Mr. Noble's opinion that the SDPD has deficient complaint policies and procedures is relevant to the determination of whether there is a custom within the SDPD of covering up officer misconduct. If mandatory reporting/anti-retaliation policies were in place, this would tend to demonstrate that the SDPD does not tolerate a widespread code of silence. However, the apparent fact that the SDPD does not have mandatory reporting or anti-retaliation policies provides further evidentiary support to Plaintiff's *Monell* claim.

Based on the evidence cited, the Court finds that genuine issues of material fact remain with respect to whether a code of silence exists within the SDPD. Arevalos' history with the department serves as primary evidence of the custom. His police record was virtually impeccable, even though he sexually abused a number of women, had a reputation for seeking out and pulling over females, and called himself the "Teflon Don." Moreover, Plaintiff's experts, after reviewing the facts of the case, conclude that the code of silence is

strictly adhered to within the SDPD. Moreover, Plaintiff's expert, Jeffrey Noble opines on the SDPD's deficient complaint acceptance and investigatory procedures, which, together, make it "nearly impossible" for an officer to be held accountable for their misconduct. All of these facts demonstrate that there remain genuine disputes as to material facts with respect to whether a code of silence exists. *See, e.g., Obrycka v. City of Chicago,* 2012 WL 601810, at *7 (N.D.Ill. Feb. 23, 2012) (summary judgment denied where plaintiff offered testimony of two experts, one opining on the existence of a code of silence and deficient administrative investigations and disciplinary procedures within the Chicago Police Department and that the CPD's sustained rates for force-related complaints were statistically significantly lower than the national average over the eight years prior to 2007, and record evidence that officers helped protect the defendant during their investigation of the plaintiff's complaint).

The City attempts to mitigate Plaintiff's evidence, arguing that the SDPD was not officially aware of several of the sexual assault cases until after Arevalos was arrested following the Jane Doe incident. Moreover, the City asserts that Plaintiff has "cobbled together" unrelated facts from an 18–year period to establish her claim. However, the City fails to address the opinions rendered by Plaintiff's experts, which contain admissible evidence of the SDPD's inadequate reporting policies and pervasive nature of the code of silence. The expert opinions, combined with Arevalos' unfortunate history with the SDPD and the other facts cited previously, create genuine issues of material fact which the Court may not resolve.

**B. Causation**

Plaintiff must also produce sufficient evidence to create a question of fact regarding whether there is a "direct causal link" between the code of silence and the deprivation of Plaintiff's constitutional rights. *Wallis v. Spencer,* 202 F.3d 1126, 1143 (9th Cir.2000). City policy "causes" an injury where it is the "moving force" behind the constitutional violation. *Chew v. Gates,* 27 F.3d 1432, 1444 (9th Cir.1994).

Construing the facts and all reasonable inferences in Plaintiff's favor, she has presented evidence raising a genuine issue as to the material fact that the code of silence caused her constitutional injury. Based on the voluminous record of misconduct engaged in by Officer Arevalos, a reasonable jury could conclude that Arevalos acted towards Jane Doe in a manner in which he thought he was impervious to the consequences of his misconduct. Arevalos called himself the "Teflon Don," flaunting the fact that no allegations could stick to him. In addition, a reasonable jury could find that Arevalos himself would have been removed entirely from the police force had the code of silence not been in place. Dr. Taylor opines, "[t]he case not only makes clear that the victims were not 'mistaken,' but that Officer Arevalos should *not* have been a police officer—most assuredly by the time that Jane Doe was stopped. Arevalos counted on the protection provided by his superiors and the administration of the SDPD that allowed him to repeatedly stalk, harass, and/or sexually assault female drivers for almost two decades." [Taylor Report ¶ 92 (emphasis in original).]

The City contends that Plaintiff cannot fulfill the causation requirement. It points to a discovery order issued by Magistrate Judge David H. Bartick, in which Judge Bartick concluded that "there is no evidence that any of the offending officers engaged in the misconduct due to an actual or perceived culture within the SDPD that encouraged officers to violate the law or

the constitutional rights of others under the belief their actions would remain immune from punishment." [Reply Brief at 4 (citing Dec. 13, 2013 Order, Doc. No. 231).] The City contends that Judge Bartick's ruling is now the "law of the case," precluding reconsideration of whether there exists a culture within the SDPD such that officers could violate the law and remain immune from punishment.

The City's argument is not persuasive. Judge Bartick's *discovery* order considered whether the personnel files of three police officers should be produced in discovery based on allegations that these officers engaged in sexual misconduct. Judge Bartick found that the personnel files were irrelevant because they did not contain evidence suggesting that the incidents were not properly investigated or that the misconduct was condoned by the police department. The order did not adjudicate the issue of whether there exists a code of silence which was the moving force behind Plaintiff's constitutional injury. Moreover, the discovery order issued by Judge Bartick cannot become the "law of the case" on the issue of *Monell* liability. *See Gonzalez v. Arizona,* 677 F.3d 383, 389 n. 4 (9th Cir.2012) ("Under the law of the case doctrine, a court will generally refuse to reconsider an issue that has already been decided by the *same court or a higher court* in the same case.") (emphasis added).

### CONCLUSION

The role of the Court in deciding a motion for summary judgment is to determine whether genuine issues of fact exist. The resolution of any factual issue is a privilege reserved for the jury. Based on the record before it, the Court finds that the City has not met its burden of demonstrating an absence of any genuine issues of fact as to its liability under *Monell.* This is not to say that Plaintiff will prevail

on her *Monell* claim at trial, only that she has adduced evidence such that a jury could return a verdict in her favor. Thus, for the reasons set forth above, the Court **DENIES** the City's motion for summary judgment.

**IT IS SO ORDERED.**