**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

$11,500.00 IN UNITED STATES CURRENCY, in rem; $2,971.00 IN UNITED STATES CURRENCY, in rem,
*Defendants*,

CHARLES GUERRERO,
*Claimant-Appellant.*

No. 14-35717

D.C. No. 3:10-cv-00097-MO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, Chief District Judge, Presiding

Argued and Submitted May 9, 2017
Portland, Oregon

Filed September 5, 2017

Before: Jay S. Bybee and Andrew D. Hurwitz, Circuit Judges, and Jed S. Rakoff,[*] District Judge.

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

Opinion by Judge Bybee;
Concurrence by Judge Hurwitz

**SUMMARY**[**]

### Civil Forfeiture

The panel reversed the district court's judgment of civil forfeiture of $11,500 under 21 U.S.C. § 881(a)(6) from claimant Charles Guerrero, and remanded for a new trial.

When Guerrero, through a friend, tried to post the $11,500 as bail for his wife, the government seized the cash. At trial, the government alleged two theories: that the money was proceeds from the claimant's drug deals, and that the claimant used or intended to use the money to facilitate drug transactions. The jury rejected the first "proceeds" theory, but found for the government on the second "facilitation" theory.

The panel held that 21 U.S.C. § 881(a)(6) does not authorize forfeiture based on mere intent to facilitate drug transactions without proof of some act to effectuate that intent. The panel held that the district court's instructions to the jury on the facilitation theory was plain error because they permitted forfeiture even if the claimant never took any step to use the money to facilitate drug transactions. The panel concluded that there was a high probability that this plain error infected the jury's verdict.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Hurwitz concurred without reservation in Parts I–IV of the panel's opinion, but acquiesced dubitante as to Part V concerning the issue of plain error because he had serious doubts that the error was plain.

## COUNSEL

Frank de la Puente (argued), Salem, Oregon, for Claimant-Appellant.

Alexis Lien (argued) and Annemarie Sgarlata, Assistant United States Attorneys; Kelly A. Zusman, Appellate Chief; United States Attorney's Office, Portland, Oregon; for Plaintiff-Appellee.

## OPINION

BYBEE, Circuit Judge:

This appeal is from a civil forfeiture of $11,500 under 21 U.S.C. § 881(a)(6). The claimant and his wife are heroin addicts, who have been buying and selling drugs for most of their lives. When the claimant, through a friend, tried to post the $11,500 as bail for his wife, the government seized the cash. At trial, the government had two theories: first, that the money was proceeds from the claimant's drug deals; second, that the claimant used *or intended to use* the money to facilitate drug transactions. The jury rejected the first "proceeds" theory, but found for the government on the second "facilitation" theory.

We hold that the district court's instructions to the jury on the facilitation theory were plain error because they permitted forfeiture even if the claimant *never took any step* to use the money to facilitate drug transactions. We cannot overlook the high probability that this plain error infected the jury's verdict, and we therefore reverse and remand for a new trial.

I

Charles and Rosalie Guerrero have been heroin addicts since the late 1980s.[1] Like many serious addicts, the Guerreros not only bought heroin but also sold it to make enough money to sustain their destructive habit. Such activities led to repeated arrests, convictions, and incarceration. This case arises out of a run-in with the law that resulted in Rosalie's arrest and detention in the Multnomah County Detention Center (MCDC) in Portland on charges of possession of heroin with intent to distribute.

A week after Rosalie's arrest, Charles drove to Portland from Salem, where he and Rosalie resided with their friend, Virgil Wood. Because Charles lacked the necessary identification to post bail at the MCDC, he asked Wood to tag along. What Charles did have, however, was some $14,000, in one hundred dollar bills, that Charles claimed Rosalie had given him for safekeeping after obtaining the money from an insurance settlement and used-car transactions. Because the Guerreros did not have a bank account, Charles kept the cash hidden under a carpet in Wood's home until his wife's arrest.

---

[1] Some evidence in the record indicates that the Guerreros have become "clean" in recent years. Even if true, it is undisputed that the couple was suffering from severe addiction during the time period at issue here.

Once in Portland, Charles gave $11,500 to Wood with instructions to post bail for Rosalie.

While Charles waited outside, Wood went to the MCDC's bail window and told an officer he was there to post the cash to free Rosalie. Jail officials ran Wood's records and discovered that he had a criminal history. Coupled with the fact that Wood was attempting to bail out a repeat drug offender with a wad of cash, this prompted jail officials to call Agent Guy Gino of the federal Department of Homeland Security. Agent Gino went to the MCDC, asked Wood a few questions regarding the origin of the $11,500, and requested permission to have a drug sniffing dog smell the currency. Wood agreed.

The dog (Nikko) alerted to a drug odor on the money. Agent Gino asked Wood if Nikko could sniff his car. Again, Wood agreed. On the way to the car, the group encountered Charles, who was waiting for Woods to come out of the jail. Charles objected to law enforcement searching the car but Wood nonetheless permitted Nikko to do so. Nikko alerted to a black bag in the vehicle—which, the officers later discovered, belonged to Charles—containing 3.6 grams of heroin. Officers also found an additional $2,971 in cash on Charles. Agent Gino arrested Charles and seized the drugs, the $2,971 found on Charles, and the $11,500 Wood had tried to post as bail.

The government then initiated civil *in rem* forfeiture proceedings against the seized currency under 21 U.S.C. § 881(a)(6). Along with the complaint, the government submitted Agent Gino's affidavit asserting "probable cause to believe the $11,500 in U.S. Currency . . . represent[ed] the proceeds from the distribution of controlled substances by

[the Guerreros]." Charles filed a claim to the cash, and this litigation ensued.

The district court granted summary judgment in favor of the government as to the $11,500, finding that the money was the "proceeds of illegal drug activity or was used to facilitate such activity." At a subsequent trial, a jury found the $2,971 also forfeitable as drug proceeds. Charles appealed, and we affirmed the judgment with respect to the $2,971, but reversed as to the $11,500, finding a genuine issue of material fact as to whether it was legitimately derived. *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1009 (9th Cir. 2013).

At trial following our remand, the government again maintained that the $11,500 was subject to forfeiture as drug proceeds. The government painted a grim picture of two unemployed drug addicts, living off food stamps and sleeping on friends' couches, who only could have derived the money from one source: sales of controlled substances, including heroin. Charles testified and frankly admitted to his criminal record, addiction, and regular involvement in the drug trade. But he claimed that the $11,500 came from an insurance settlement Rosalie had reached four years before the seizure. He said she had taken that money and invested it in her own used-car business. Rosalie corroborated her husband's testimony, attesting that the $11,500 came from an insurance settlement and used-car sales. The government attacked the Guerreros' testimony, noting, for instance, that four years had passed since the settlement, that during that time the Guerreros had few means of support, and that there were no records of Rosalie's alleged car business.

The jury instructions presented alternative legal theories for the forfeiture. The first was the "proceeds theory," on which the government had focused its case, which authorized forfeiture of any money derived from drug sales. The second theory—which the district court called the "facilitation theory"—authorized forfeiture if the money "was used or was intended to be used to facilitate illegal drug activity." Although the district court did not divide the second theory into its two distinct prongs ("used" and "intended to be used"), it broadly instructed the jury that "'[f]acilitating property' includes any property that makes the prohibited conduct 'less difficult or more or less free from obstruction or hindrance.'" The jury instructions on the two theories of forfeiture were derived directly from the controlling statute, § 881(a)(6), and neither party objected to them.

In closing, the government spent the vast majority of its time on the proceeds theory, attempting to convince the jury that the money came from heroin sales. But, at a few points, the government also mentioned the facilitation theory, focusing almost exclusively on the "intended to be used" prong. The government argued forcefully that if "Ms. Guerrero hadn't ended up in jail," the Guerreros would have used the $11,500 "to facilitate drug trafficking." The only evidence cited in support of that proposition was that the Guerreros were heavily addicted to heroin, "using daily, buying and selling on a daily or weekly basis." In light of such addiction, it was very likely, the government argued, that the Guerreros would have used the $11,500 "to keep their habit going," and though on "[t]his particular occasion, [they] were] using [their] money for one thing, . . . what did [they] *intend* to use it for?"

After closing arguments, the district court issued a special verdict form almost identical to one jointly submitted by the parties. The form asked the jury two questions:

> 1. Has the United States proven by a preponderance of the evidence that the $11,500 is the proceeds of an exchange or exchanges for a controlled substance?

> 2. Has the United States proven by a preponderance of the evidence that at least a portion of the $11,500 was used or intended to be used to facilitate an exchange or exchanges of a controlled substance?

During deliberations, the jury advised the court that it could not reach a unanimous verdict. The parties stipulated to a non-unanimous verdict. Each juror then voted *against* the proceeds theory, and six of seven jurors voted *in favor* of the facilitation theory. The $11,500 was thus forfeited to the government.

Charles subsequently filed a Motion to Amend Judgment under Rule 59, asserting violations of his Fifth Amendment due process rights and his Eighth Amendment right to be free from cruel and unusual punishment. Charles argued that the verdict could be explained on only one ground: the jury must have found that the $11,500 was "clean" but that the Guerreros nonetheless intended, at some indeterminate point in time, to use the money to buy drugs. Such a verdict could not stand, Charles contended, because it punished the Guerreros not for their conduct but instead only for their bad thoughts.

The district court denied the motion in a one-paragraph order. It found that the jury could have determined that the Guerreros used the cash to facilitate their drug trade because "[s]tores of cash can facilitate drug transactions even if the cash is not itself the proceeds of such a transaction." The district court rejected Charles' Eighth Amendment claim, finding § 881 not punitive.

## II

Charles raises the same contention before us as he did in his Rule 59 motion—that the money was forfeited based on "intent without conduct." Although we understand the core of Charles' arguments, he does not clearly identify what aspect of the trial he takes issue with. He asserts that he is challenging the judgment, but does not specify whether is challenging the jury instructions, the sufficiency of the evidence, the denial of the Rule 59 motion, or something else.

Because Charles did not file a Rule 50(b) motion, we cannot review for sufficiency of the evidence. *See Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) ("[T]he Supreme Court [has] held that a post-verdict motion under Rule 50(b) is an absolute prerequisite to any appeal based on insufficiency of the evidence.") (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006)). Rather, Charles' arguments are best characterized as challenges to the jury instructions, which permitted the jury to rule in the government's favor if it found the money "was intended to be used to facilitate illegal drug activity." Charles does not dispute that he failed to challenge these instructions or any other relevant ruling at trial. We therefore review the instructions for plain error. *See* FED. R. CIV. P. 51(d)(2);

*United States v. Ruiz*, 462 F.3d 1082, 1087 (9th Cir. 2006). We conclude that there was plain error here.

III

Before delving into the Charles' alleged legal error, we must first analyze whether we can affirm the jury's verdict irrespective of that error. As noted above, the facilitation theory the jury accepted required one of two distinct findings: (1) that the $11,500 was "used" to facilitate a drug transaction or (2) that it was "intended to be used" to facilitate the same.[2] If the jury's verdict rested on the "used" prong, then Charles' argument that the district court erred in instructing the jury on intent is beside the point and our analysis is at an end.

The Supreme Court explained long ago that if a verdict's "generality prevents [the court] from perceiving upon which plea [the jury] found," and "any one issue error was

---

[2] The statute under which the Guerreros' money was forfeited provides:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
> . . .
>
> (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a).

committed, either in the admission of evidence, or in the charge of the court, the verdict cannot be upheld, for it may be that by that evidence the jury were controlled under the instructions given." *Maryland v. Baldwin*, 112 U.S. 490, 493 (1884). The Court has reiterated this "general verdict" rule on several occasions, *see, e.g.*, *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29–30 (1962); *United N.Y. & N.J. Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619 (1959), and applied it in circumstances somewhat similar to those before us now, *Robinson v. California*, 370 U.S. 660, 662, 665 (1962) (reversing a general verdict finding that Robinson "either . . . use[d] narcotics, or [was] addicted to the use of narcotics" because punishment for mere addiction to narcotics is unconstitutional and it was impossible to tell which theory the jury adopted).

Some circuits follow the *Baldwin* general verdict rule strictly, refusing to uphold a general verdict unless it is absolutely clear that the jury did not rely on the defective theory; other circuits have adopted a harmless error rule. *See Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1299–1300 (10th Cir. 1989) (surveying the circuits). We have taken a more pragmatic approach, stating that we retain the "discretion to construe a general verdict as attributable to [a non-defective] theory if it was supported by substantial evidence and was submitted to the jury free from error." *Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir. 1980). In considering whether to exercise that discretion, we consider four factors:

> (1) the potential for confusion of the jury;
> (2) whether the losing party's defenses apply
> to the count upon which the verdict is being
> sustained; (3) the strength of the evidence

supporting the count relied upon to sustain the verdict; and (4) the extent to which the same disputed issues of fact apply to the various legal theories.

*Id.* at 938–39; *Webb v. Sloan*, 330 F.3d 1158, 1166 (9th Cir. 2003) (citation omitted); *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1440 (9th Cir. 1996) (citation omitted).

Here, the special verdict form did not separate the "used" and "intended to be used" prongs, and we therefore cannot know for sure whether the jury found that the Guerreros actually used or merely intended to use the $11,500 to facilitate drug transactions.[3]  We have unsuccessfully searched the record for any evidence of the Guerreros using the $11,500 to facilitate their drug operations before the seizure of the funds.  Indeed, the government's theory of the case largely ignored the "used" prong in favor of arguing that the Guerreros' intent to facilitate drug transactions was, by itself, sufficient for forfeiture:

> Now, the used or intended to be used to commit or facilitate a controlled substance crime. $11,500 in cash.  If Ms. Guerrero hadn't ended up in jail June 25th, 2009, *what do you think that currency would have been used for?*  At a time in their life when they're both using daily, buying or selling on a daily or a weekly basis, they are so addicted that every time they buy, essentially they have to

---

[3] Although the verdict here was special, it is appropriate to apply the general verdict rule to the "general" aspects of a special verdict.  *See Webb*, 330 F.3d at 1167.

deal to keep their own habit going, because when you don't have other money coming in in order to buy your next dose or round or what have you, you need some money.

. . .

The fact that it was in this particular instance being tendered to the jail as bail money does not negate that had that not happened, *it was intended to be used* for controlled substance trafficking.

. . .

And the money he had in his pocket [the $2,971] was the proceeds of [drug sales] *or was going to be used to facilitate further drug trafficking, just like the $11,500.*

. . .

    *Here it was intended to be used to commit or facilitate*, make easier further drug trafficking.

Read as a whole, the government's closing presented the jury with two choices: either find that the Guerreros derived the money from selling drugs (the proceeds theory) or that they intended to use it in the future to facilitate the buying and selling of drugs (the facilitation theory). The government never offered the jury a third option of finding that the $11,500 was not the proceeds of past drug transactions but had been used to facilitate past drug transactions. Even if it

had, we would still have the dilemma of not knowing which path the jury took to reach its verdict.

Given the record, the government's arguments, and the fact that the jury found the money was not "proceeds" from past drug transactions, we are unwilling to assume the jury found that the Guerreros actually used, as opposed to only intended to use, the $11,500 to facilitate drug transactions. The *Traver* factors strengthen this conclusion. First, the wording of the statute, coupled with government's closing argument, could have led the jury to believe that general intent to use money to facilitate drug transactions at any point suffices for forfeiture. Second, Charles' defenses did not apply equally to both prongs of the facilitation theory. In other words, the jury might well have accepted the Guerreros' claim that the money came from legitimate sources but nonetheless found that the Guerreros intended to use the $11,500 to facilitate drug transactions. Third, the jury appears to have dismissed the government's evidence showing that the Guerreros received the cash in exchange for heroin by rejecting the proceeds theory. And fourth, different disputed issues of fact applied to the two theories: Charles contended vigorously that the money was "clean" and did not come from drug sales, but did not appear to dispute that he and Rosalie would likely have used the bail money to purchase drugs at some point in the future.

In short, there is a very real danger, one that we cannot ignore under *Traver*, that the jury focused solely on the Guerreros' intent to facilitate future drug transactions. Given that danger, we must reach the ultimate question in this case: Does either § 881(a)(6) or the Constitution permit the forfeiture of money in the possession of drug addicts who

merely intended to use it for drug purchases without taking any steps to effectuate their intent?

IV

We begin with the language of the statute. It permits forfeiture of "all proceeds traceable to . . . an exchange [of a controlled substance], and all moneys . . . used or *intended to be used* to facilitate any violation of [federal drug laws]." 21 U.S.C. § 881(a)(6) (emphasis added). The statute follows the format of many other provisions permitting forfeiture of property that was "intended to be used" in certain crimes. *See*, *e.g.*, 18 U.S.C. § 1467(a)(3) (providing for forfeiture of any property "used or intended to be used to commit or to promote the commission of [a federal offense involving obscene materials]"); *id.* § 2323(a)(1)(B) (providing for forfeiture of any property "used, or intended to be used, in any manner or part to commit or facilitate the commission of an [offense of willful copyright infringement, among others]"); *id.* § 2428(b)(1)(A) (providing for forfeiture of any property "used or intended to be used to commit or facilitate the commission of [the crime of transporting an individual in interstate commerce with intent to engage that individual in prostitution]").

Despite the prevalence of the phrase "intended to be used" in federal forfeiture statutes, only a handful of published decisions have relied on it to justify forfeiture. All those decisions involved an actor taking substantial, concrete steps in an attempt to use the subject property in a drug deal, thus making the property temporally proximate to a planned drug offense. *See*, *e.g.*, *Adames v. United States*, 171 F.3d 728, 733 (2d Cir. 1999) (actor attempted to use money to purchase drugs from an undercover agent); *United States v.*

*$84,000 U.S. Currency*, 717 F.2d 1090, 1101 (7th Cir. 1983) (actors traveled to other states in an attempt to purchase drugs with money but were unsuccessful); *United States v. RD 1, Box 1*, 952 F.2d 53, 58 (3d Cir. 1991) (actor mortgaged a house to obtain drug money).  We know of no case that has permitted forfeiture of property when someone simply thought of using the property in a crime without taking any corresponding action.

On its face, however, § 881(a)(6) contains no limiting principle and appears to apply whenever anyone, at any point in time, so much as *thinks* about using money to purchase drugs.  One need not look any further than this case to realize how far the literal language of § 881(a)(6) could reach.  The only evidence from which the jury could have concluded that the Guerreros intended to use the $11,500 for drugs shows that the couple were heavy heroin addicts who bought and sold drugs regularly.  The government offered no specifics. Although it should surprise no one that an addict might think of spending whatever money he has to sustain his addiction, the Guerreros, so far as the evidence indicates, did not act on any such thoughts *with respect to the $11,500*.[4]  In fact, at the time Agent Gino seized their money, the Guerreros had entrusted it to Virgil Wood, who was standing at a bail window in the MCDC asking to bail out Rosalie.  Was there some possibility that, prior to Wood walking in the MCDC, the Guerreros intended to use the money for drug transactions? Of course.  And is there a likelihood that if the Guerreros got the bail money back they would have used

---

[4] By contrast, we had no difficulty affirming the forfeiture of the $2,971 that Charles had on his person (together with drugs) while Wood was inside trying to post bail.  *$11,500 in U.S. Currency*, 710 F.3d at 1016.

some part of it in the future for drugs?  Again, it seems reasonable to answer "of course."  Does § 881(a)(6) reach either back in time to unrealized intentions or forward in time to speculative, inchoate plans?  We think not.

Such a broad, literal interpretation of § 881(a)(6) would run into serious constitutional problems.  In these circumstances, "a cardinal principle" of statutory interpretation requires us to "ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided."  *Crowell v. Benson*, 285 U.S. 22, 62 (1932).  It is possible to construe § 881(a)(6) as implicitly requiring, before permitting forfeiture, that an actor who intends to use the money as facilitating property take some action manifesting his intent.  Such a construction would alleviate any constitutional concerns and bring § 881(a)(6) in line with the traditional understanding of civil forfeiture.  Before deciding how to construe § 881(a)(6), we first examine some common law history and its influence on the law of federal inchoate crimes and Eighth Amendment jurisprudence.

A

"Never, the maxim has it, do we punish an evil intent alone."  Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 YALE L.J. 405, 405 (1959).  Despite a few hiccups here and there, *see* Statute of Treasons, 1351, 25 Edw. 3, c. 2 (Eng.) (deeming it treasonous to "imagine" the death of the King, Queen, or King's eldest son and heir), our common law ancestors appreciated and adhered to that maxim.  Sir William Blackstone wrote, "[A]s no temporal tribunal can search the heart, or fathom the intentions of the mind, otherwise than as they are demonstrated by outward

actions, it therefore cannot punish for what it cannot know." 4 WILLIAM BLACKSTONE, COMMENTARIES \*21; *see Hales v. Petit* (1562) 75 Eng. Rep. 387, 397 1 Plow. 253, 259 ("[T]he imagination of the mind to do wrong, without an act done, is not punishable in our law, neither is the resolution to do that wrong, which he does not, punishable, but the doing of the act is the only point which the law regards; for until the act is done it cannot be an offence to the world, and when the act is done it is punishable."); Brian, J., YB 17 Edw. 4 Pasch, f. 2, pl. 2 (1477) (Eng.) ("It is common knowledge that the thought of man shall not be tried, for the Devil himself knoweth not the thought of man."). It was taken almost as a given that the existence of some act was necessary to subject the actor to punishment. As Lord Coke remarked, "[I]f a man had compassed the death of another, and had uttered the same by words or writing, yet he should not have died for it, for there wanted an overt deed tending to the execution of his compassing." EDWARD COKE, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 5 (1644).

These fundamental principles proved important during the early development of the law of inchoate crimes. Recognizing that such crimes came close to punishing bad thoughts, common law courts required the prosecution to show that the defendant had taken some step to manifest his intent. For instance, in a case that spurred the development of the modern doctrine of attempt, an English court permitted the punishment of a defendant who intended to burn down a house, but only because he lit a candle close to combustible material he had placed inside. *Rex v. Scofield* (1784) 3 Cald. 397 ("The intent may make an act, innocent in itself, criminal; nor is the completion of an act, criminal in itself, necessary to constitute criminality."); *see* 2 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL

LAW § 11.2(a) (2d. ed. Supp. 2016) [hereinafter SUBSTANTIVE CRIMINAL LAW]. The requirement of some overt act also appeared in decisions involving the offenses of conspiracy and solicitation, where an agreement or a request to commit crime was deemed a sufficient manifestation of the defendant's bad intent. *See* SUBSTANTIVE CRIMINAL LAW, §§ 11.1(a), 12.2(b) (citing *Rex v. Higgins* (1801) 102 Eng. Rep. 269 (solicitation); *King v. Gill* (1818) 106 Eng. Rep. 341 (conspiracy)).

The common law requirement of an act has been suffused into our own jurisprudence. As the leading treatise on criminal law has put it, "Bad thoughts alone cannot constitute a crime; there must be an act, or an omission to act where there is a legal duty to act." SUBSTANTIVE CRIMINAL LAW § 11.4; *see* MODEL PENAL CODE § 2.01 cmt. (AM. LAW INST. 1985) ("It is fundamental that a civilized society does not punish for thoughts alone."). And courts have taken that proposition as self-evident, not requiring any significant elaboration. *See People v. Belcastro*, 190 N.E. 301, 303 (Ill. 1934) ("With mere guilty intention, divorced from an overt act or outward manifestation thereof, the law does not concern itself."); *Lambert v. State*, 374 P.2d 783, 785 (Okla. Crim. App. 1962) ("An unexecuted intent to violate the law amounts to no more than a thought, and is not punishable as a crime." (citation omitted)).

Like their common law antecedents, federal inchoate offenses require that an actor take some step to manifest his bad intent or purpose. Take, for instance, the law of criminal attempt. "As was true at common law, the mere intent to violate a federal criminal statute is not punishable as an attempt unless it is also accompanied by significant conduct," *i.e.* "an overt act qualifying as a substantial step." *United*

*States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007). The same is true for the crime of conspiracy: the general conspiracy statute explicitly requires that some overt act be performed, 18 U.S.C. § 371, and more specific conspiracy provisions without that requirement contemplate that "the criminal agreement itself is the *actus reus*," *United States v. Shabani*, 513 U.S. 10, 16 (1994). Ditto for the crime of solicitation. *See* 18 U.S.C. § 373 (making it a crime to "solicit[], command[], induce[], or otherwise endeavor[] to persuade" another person to commit a felony involving physical force).[5]

These foundational common law principles have been read into the Eighth Amendment, which prohibits "excessive fines" and "cruel and unusual punishments." U.S. Const.

---

[5] The problem of punishing thoughts alone creates other complications as well. For example, those who take some overt act as a manifestation of their criminal intent may nevertheless escape conviction for attempt, conspiracy, or solicitation if they can show that they voluntarily abandoned their plans before they were apprehended. SUBSTANTIVE CRIMINAL LAW, §§ 11.1(d), 11.4(b)(2), 12.4(b). Although the defense of abandonment—sometimes referred to as the *locus poenitentiae*, or opportunity for repentance—is not available in all jurisdictions, it has been recognized in some jurisdictions and recommended by the Model Penal Code. *Id.* (collecting cases and statutes recognizing the defense); *see* MODEL PENAL CODE §§ 5.01(4), 5.02(3), 5.03(6). In this case, for example, it is possible that Charles intended to take the $11,500 into Portland to buy drugs but changed his mind once he got there and decided to bail out Rosalie instead. It would be an interesting case if the police had apprehended him on his way into town; it seems a very different case once Charles entrusts the money to Wood, who goes into the MCDC to pay Rosalie's bail.

amend. VIII.**⁶**   Two Supreme Court cases are helpful to understand how the Eighth Amendment operates in this context: *Robinson*, 370 U.S. 660, and *Powell v. Texas*, 392 U.S. 514 (1968).   In *Robinson*, the Court considered a statute making it a crime for a person to do nothing more than "be addicted to the use of narcotics."  370 U.S. at 662.  Such a statute, "which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug with the State or been guilty of any irregular behavior there," the Court held, "inflicts a cruel and usual punishment."  *Id.* at 667; *see* SUBSTANTIVE CRIMINAL LAW § 3.5(g) (discussing *Robinson*).   In *Powell*, the defendant had been arrested for being intoxicated in a public place.  His defense was that he was an alcoholic and that after *Robinson*, he could not be punished for his status.  The Court rejected his argument.  A plurality of the Court agreed that

---

**⁶** The Supreme Court has held that civil *in rem* forfeitures under §§ 881(a)(4) and (7)—applicable to transportation vehicles and real property that are "used" or "intended to be used" to facilitate the commission of a drug offense—constitute punishments covered by the Excessive Fines Clause of the Eighth Amendment.  *Austin v. United States*, 509 U.S. 602, 622 (1993).   We find no basis on which to distinguish §§ 881(a)(4) and (7) from the facilitation prong of § 881(a)(6), and the government offers none.

We note that our conclusion is limited to the facilitation and not the proceeds prong of § 881(a)(6).  We have previously made clear that the proceeds prong falls outside the ambit of the Eighth Amendment because "[f]orfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity."  *United States v. Real Prop. Located at 22 Santa Barbara Drive*, 264 F.3d 860, 874 (9th Cir. 2001) (alteration in original) (citation omitted).

> [T]he entire thrust of *Robinson*'s interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*.

*Powell*, 392 U.S. at 533 (plurality opinion). According to the plurality, therefore, Powell could not succeed because he "was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion"—an action that the government could lawfully punish. *Id.* at 532; *see also id.* at 543 (Black, J., concurring) ("Punishment for a status is particularly obnoxious, and in many instances can reasonably be called cruel and unusual, because it involves punishment for a mere propensity, a desire to commit an offense; the mental element is not simply one part of the crime but may constitute all of it."); *id.* at 553–54 (White, J., concurring) (noting that Powell showed "he was to some degree compelled to drink," but "made no showing that he was unable to stay off the streets on the night in question"). The four dissenting Justices in *Powell*, who argued for a much broader interpretation of *Robinson*, agreed that *Robinson* meant that "[c]riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." *Id.* at 567 (Fortas, J., dissenting); *see also United States v. Ocegueda*, 564 F.2d 1363, 1367 (9th Cir. 1977) (holding that legislation did not violate the Eighth Amendment under *Robinson* because it punished acts).

The Court's reasoning in *Robinson* and *Powell* applies with equal force to any punishment for bad thoughts.[7] Accordingly, if the forfeiture at issue were a punishment for the Guerreros' mere intent to use the $11,500 for bad purposes, it would likely violate the Eighth Amendment.[8] And, as our discussion above makes clear, we cannot exclude the possibility that the jury's verdict rested on the Guerreros' mere intent.[9]

---

[7] Indeed, forfeiture for thinking about using money to buy drugs comes perilously close to prescribing punishment for the status of being an addict. Under the government's theory, any money the Guerreros came into would be subject to forfeiture.

[8] We would reach the same result even without reference to the status cases. Under the Eighth Amendment, "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). We consider four factors in determining whether a particular forfeiture is "grossly disproportional" to the gravity of the offense: "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *United States v. Beecroft*, 825 F.3d 991, 1000 (9th Cir. 2016). These factors *presume* that some crime was committed that caused harm and for which penalties may be imposed. But the government here, at least according to the jury's verdict, failed to tie the money to any crime. And if neither the Guerreros nor anyone else committed a crime with respect to the $11,500, it would be surely excessive to confiscate that cash.

[9] It might well be that § 881(a)(6) would also violate the First Amendment if interpreted literally. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67 (1973) ("The fantasies of a drug addict are his own and beyond the reach of government [under the First Amendment] . . . ."); *see also United States v. Balsys*, 524 U.S. 666, 714 (1998) (Breyer, J., dissenting) ("[T]he First Amendment protects against the prosecution of thought crime."); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought [is] protected by the First Amendment against

B

Our respect for Congress requires us to construe § 881(a)(6) in a manner that would avoid constitutional problems if fairly possible. *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998) ("The doctrine seeks in part to minimize disagreement between the branches by preserving congressional enactments that might otherwise founder on constitutional objections."); *Crowell*, 285 U.S. at 62. The Supreme Court has read significant limitations into other statutes when faced with constitutional deficiencies. *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (reading an implicit reasonableness limitation into an immigration statute because a literal interpretation would have raised constitutional concerns); *United States v. Witkovich*, 353 U.S. 194, 199, 202 (1957) (interpreting a statute that "if read in isolation and literally, appear[ed] to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of aliens" as being limited to information "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue"). "But where Congress has made its intent clear, 'we must give effect to that intent.'" *Miller v. French*, 530 U.S. 327, 336 (2000) (citation omitted).

We see no indication that Congress intended to jettison the centuries-old maxim *cogitationis poenam nemo patitur* (no one is punishable solely for his thoughts) that permeates

state action."); *Doe v. City of Lafayette*, 377 F.3d 757, 759–61 (7th Cir. 2004) (en banc) ("A government entity no doubt runs afoul of the First Amendment when it punishes an individual for pure thought.").

our law. Rather, it is possible to read § 881(a)(6) as requiring what virtually every statute inflicting punishment has assumed throughout our history: there must be some act performed in an attempt to effectuate the actor's intent. *See Robinson*, 370 U.S. at 665 (noting that "[i]t would be possible to construe the statute under which the appellant was convicted"—the one criminalizing being addicted to drugs—as being "operative only upon proof of the actual use of narcotics within the State's jurisdiction"). We need not define at this juncture just how substantial a step the actor must take before her money could be forfeited under § 881(a)(6). We hold only that § 881(a)(6) does not authorize forfeiture based on mere intent to facilitate drug transactions without proof of some act to effectuate that intent. We have little difficulty concluding that the offering of a drug addict's money to a police officer at a detention facility as bail for the addict's wife is not the affirmative step contemplated by § 881 to justify forfeiture.

In sum, we hold only that § 881(a)(6) does not authorize forfeiture based on mere intent to facilitate drug transactions without proof of some act to effectuate that intent. The district court erred by failing to include this limiting principle in its instructions to the jury.

V

We are left only with determining whether this error constitutes plain error and requires reversal. When counsel fails to object at trial, it deprives the government of the opportunity to respond and, more importantly, denies the district court the opportunity to address the objection and correct any error. In the ordinary course, counsel's failure to object is deemed forfeiture or waiver of the claim. *See*

*United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc).  Nevertheless, under Rule 51(d)(2), "A court may consider a plain error in the [jury] instructions that has not been preserved . . . if the error affects substantial rights." FED. R. CIV. P. 51(d)(2); *see also* FED. R. CRIM. P. 52(b) (similar rule for criminal cases).  These rules "authorize[] an appeals court to correct a forfeited error only if (1) there is 'an error,' (2) the error is 'plain,' . . . (3) the error 'affect[s] substantial rights[,]'" . . . [and] (4) . . . 'the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Henderson v. United States*, 568 U.S. 266, 272 (2013) (quoting *United States v. Olano*, 507 U.S. 725, 732, 736 (1993) (second alteration in original) (citations omitted)).

For the reasons we have explained, it was error for the district court to instruct the jury that the $11,500 could be forfeited if it "was intended to be used to facilitate illegal drug activity" without providing some limiting principle. That broad instruction, coupled with the government's argument encouraging the jury to find forfeiture based on the Guerreros' intent alone, resulted in a verdict of questionable validity.  *See United States v. Hernandez*, 859 F.3d 817, 824 (9th Cir. 2017) (invalidating a verdict because of a broad jury instruction and the government's improper closing argument).

The error was plain.  Although it is hard to fault the district court for giving an instruction that tracked the language of § 881(a)(6), the statute cannot mean what it literally appears to say.  *See United States v. Paul*, 37 F.3d 496, 497 (9th Cir. 1994) (reversing for plain error even though the district court gave the Ninth Circuit model jury instructions).  For hundreds of years, the common law from which we derive the core principles of our criminal law has

held that mere intent without some act to carry out the intent is not a sufficient basis for punishment. That principle is reflected in the way in which we have long approached inchoate crimes such as attempt, conspiracy, and solicitation. It has been also captured in various ways in our Eighth Amendment jurisprudence, which prohibits punishing someone for their desires divorced from any action in furtherance of those desires.

The error here also affected substantial rights. As discussed above, we cannot exclude the possibility—and, indeed, it seems likely—that the jury found the $11,500 forfeited based only on evidence of mere intent without action. Based on the record before us, and particularly in light of the government's argument that the Guerreros simply intended to use the money for drugs in the future in light of their addiction, an instruction requiring some act in furtherance of the Guerreros' bad intent may well have produced a different outcome.

That leaves us with the question whether the error affected the fairness, integrity, or public reputation of the proceedings. The Supreme Court has emphasized that "plain-error review is not a grading system for trial judges." *Henderson*, 568 U.S. at 278. Rather, it has "broader purposes," including "allowing courts of appeals better to identify those instances in which the application of a new rule of law to cases on appeal will meet the demands of fairness and judicial integrity." *Id.* Although we are not applying a new rule in this case, we frankly admit that this case requires the application of an old rule in a context in which we have not had occasion to apply it before. On the whole, we think that justice and fairness requires its application in this case.

The judgment is **REVERSED** and the case is remanded to the district court for a new trial.

---

HURWITZ, Circuit Judge, concurring in Parts I–IV and as to Part V, acquiescing dubitante:

This is an exceedingly strange case. There was ample evidence that the currency at issue was proceeds from a drug transaction, but the jury did not so find. And, as Judge Bybee's scholarly opinion convincingly demonstrates, the district court's alternative instruction that the $11,500 could be forfeited simply because Guerrero harbored an inchoate intent to use it to facilitate an unspecified future drug transaction was wrong. I agree that the better reading—indeed, perhaps the only constitutional reading—of 21 U.S.C. § 881(a)(6) is that currency is not subject to civil forfeiture unless its possessor has done more than simply think about using it in an illegal fashion. Moreover, even assuming that the jury instruction correctly stated the law, there was simply no evidence that, when the money was seized, Guerrero harbored any intent to use it to facilitate a drug transaction. Rather, the currency had been proffered to authorities for Mrs. Guerrero's bail and the res was thus incapable of illegal use.

But, Guerrero did not object to the jury instruction that the Court today finds erroneous. Indeed, he submitted it, along with the jury verdict form. And, Guerrero waived any objection to the sufficiency of the evidence by failing to seek judgment as a matter of law under Federal Rule of Civil Procedure 50(b).

Thus, although I concur without reservation in Parts I–IV of today's opinion, I have serious doubts that the error was plain. The Supreme Court has defined a "plain error" as "clear or, equivalently, obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993) (internal quotation marks omitted). It is counterintuitive that an error it takes some nineteen pages to explicate—with nary a word wasted—should have been clear or obvious to the district court, particularly because there is no Supreme Court or Ninth Circuit case directly on point and the relevant instruction mirrors the statutory language.

Had Guerrero's counsel sought judgment as a matter of law, he might well be entitled to a remand with instructions to enter judgment in his favor. And, had his counsel objected to the jury instructions, the district court would have had the opportunity to consider the issues so well parsed in Judge Bybee's opinion. In a civil case, there should be consequences to counsel's omissions—strategic or inadvertent—and, in other circumstances, I would impose those consequences to Guerrero's detriment. But in the situation before us, particularly given the jury verdict that the $11,500 was *not* the proceeds of a drug transaction, and the absence of any evidence that the money was intended to be used for anything but bail when seized, the Court's remand for a new trial accomplishes substantial justice. In Judge Friendly's memorable words, "I therefore go along with the majority, although with [ ] doubts." *Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 393 (2d Cir. 1975) (Friendly, J., *dubitante*).